UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| SCOTT READ, et al., | Case No.:  CV 08-CV-00099 |
| Plaintiffs, | **REPORT AND RECOMMENDATION RE:** |
| vs. | **PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT** |
| TETON SPRINGS GOLF & CASTING CLUB, LLC, et al., | **(Docket No. 302)** |
| Defendants. | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (AGENCY)** |
| | **(Docket No. 307)** |
| CHRIS HAMABE, et al. | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (AFFIRMATIVE DEFENSES)** |
| Plaintiffs, | **(Docket No. 325)** |
| vs. | **ALL SEASONS' MOTION FOR PARTIAL SUMMARY JUDGMENT (INVESTMENT LOSSES)** |
| TETON SPRINGS GOLF & CASTING CLUB, LLC, et al., | **(Docket No. 338)** |
| Defendants. | **TETON SPRINGS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND JOINDER** |
| | **(Docket No. 344)** |
| | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)** |
| | **(Docket No. 332)** |

**REPORT AND RECOMMENDATION - 1**

Currently pending before the Court are six motions: (1) Plaintiffs' Motion for Leave to File Third Amended Complaint (Docket No. 302); (2) Plaintiffs' Motion for Partial Summary Judgment (Agency) (Docket No. 307); (3) Plaintiffs' Motion for Partial Summary Judgment (Affirmative Defenses) (Docket No. 325); (4) All Seasons' Motion for Partial Summary Judgment (Investment Losses) (Docket No. 338); (5) Teton Springs' Motion for Partial Summary Judgment and Joinder (Docket No. 344); and (6) Plaintiffs' Motion for Partial Summary Judgment (Fraud) (Docket No. 332). Having carefully reviewed the record, heard oral argument, and otherwise being fully advised, the Court enters the following Report and Recommendation:

## GENERAL BACKGROUND

This case has many moving parts; however, since the beginning, the general backdrop of Plaintiffs' claims relates to the development, marketing, purchase, sale, and construction of 28 lots and homes in the "Teton Springs" real estate development in Victor, Idaho. *See, e.g.*, Mem. in Supp. of Pls.' Mot. for Leave to File Pls.' Third Am. Compls., p. 2 (Docket No. 303). As purchasers of these 28 lots and homes, Plaintiffs take issue with the alleged manner in which Defendants marketed and sold those properties. Defendants, in turn, deny these allegations, contending further that Plaintiffs themselves were integral and knowledgeable players in an investment plan that ultimately backfired.

## REPORT

## I.  Plaintiffs' Motion for Leave to File Third Amended Complaints (Docket No. 302)

Given the size of the docket, it is obvious that the issues in this case have evolved over time. Since February 2008 when the action was first filed (Docket No. 1), it has been assigned

**REPORT AND RECOMMENDATION - 2**

and/or referred to three federal judges, at least one law firm is no longer in the fray, and the pleadings have undergone a number of amendments.

On January 23, 2009, Plaintiffs filed their Amended Complaint (Docket No. 152).  On August 11, 2009, Chief U.S. District Judge B. Lynn Winmill granted Plaintiffs' Motion for Leave to File (and deemed filed) Plaintiffs' Second Amended Complaint (Docket No. 268) - the current, operative Complaint.  Plaintiffs then moved for leave to file their Third Amended Complaints on October 2, 2009 (Docket No. 302) - the instant Motion.

According to Plaintiffs, "[t]hese new amended complaints are substantively similar to Plaintiffs' second amended complaints", but seek "to specifically recognize and adopt the punitive damages claims in Plaintiffs' live pleadings" and "also state claims for gross negligence and negligence per se.  *See* Mem. in Supp. of Pls.' Mot. for Leave to File Pls.' Third Am. Compls., p. 2 (Docket No. 303).

Defendants oppose Plaintiffs' amendment efforts, arguing that (1) a claim for punitive damages is not warranted under Idaho Code section 6-1604, and (2) Plaintiffs' attempt to add new state law claims - gross negligence and negligence per se - is untimely and violative of the Court's applicable Scheduling Order.  *See, e.g.*, All Seasons' Opp. to Pls.' Mot. for Leave to File Pls.' Third Am. Compls. (Docket No. 316); Teton Springs' Opp. to Pls.' Mot. for Leave to File Pls.' Third Am. Compls. (Docket No. 317).  Therefore, Plaintiffs' Motion for Leave to File Third Amended Complaints presents two issues - whether Plaintiffs' Complaints should be amended to include, first, a prayer for punitive damages, and, second, claims for gross negligence and negligence per se.

**REPORT AND RECOMMENDATION - 3**

A.    <u>Punitive Damages Under Idaho Law</u>[1]

While FRCP 15(a) encourages the liberal granting of motions to amend pleadings,

whether to amend the pleadings to assert a claim for punitive damages related to claims arising

under Idaho state law is another matter, requiring a different standard as is consistently reflected

in the voluminous case law in this jurisdiction.  Due to the strict conditions precedent to (and the

general disfavor of) punitive damages, a plaintiff will be allowed to amend the pleadings to

assert a claim for punitive damages only if, after weighing the evidence presented, the Court

concludes that a plaintiff has established a reasonable likelihood of proving, by clear and

convincing evidence, that Defendants' conduct was oppressive, fraudulent, malicious, or

outrageous.  *See Vendelin v. Costco Wholesale Group*, 95 P.3d 34, 41 (2004); *see also Boise*

*Tower Associates LLC v. Washington Capital Joint Master Trust*, 2006 WL 1749656, *12 (D.

Idaho 2006) ("A prayer for punitive damages is not a stand-alone cause of action; instead, it

flows from an underlying cause of action, such as breach of contract or a tort, when the conduct

of a party meets the threshold level of being oppressive and outrageous.").

Punitive damages will only be allowed when the defendant acted in a manner that was

"an extreme deviation from reasonable standards of conduct, and that the act was performed by

the defendant with an understanding of or disregard for its likely consequences."  *See Manning*

*v. Twin Falls Clinic & Hosp., Inc.*, 830 P.2d 1185, 1190 (1992) (quoting *Cheney v. Palos Verdes*

*Inv. Corp.*, 665 P.2d 661, 669 (1983)).  More recently, the Idaho Supreme Court further defined

---

[1]  Claims for punitive damages are substantive in nature and Idaho law is controlling.  *See*
*Strong v. Unumprovident Corp.*, 393 F. Supp. 2d 1012, 1025 (D. Idaho 2005) ("The question of
whether to permit a claim for punitive damages is substantive in nature and accordingly is
controlled by relevant Idaho case law.") (citing *Doe v. Cutter Biological*, 844 F. Supp. 602, 610
(D. Idaho. 1994)).

**REPORT AND RECOMMENDATION - 4**

the parameters for such an award, stating that, "to support an award of punitive damages,

[plaintiff] must prove [defendant's] actions toward [plaintiff] constituted an extreme deviation

from standards of reasonable conduct, which was done with knowledge of the likely

consequence *and* an extremely harmful state of mind." *See Seiniger Law Office, P.A. v. North

Pacific Ins. Co.*, 178 P.3d 606, 615 (2008) (emphasis added).  In other words, as acknowledged

by counsel during oral argument, "[t]he issue revolves around whether the plaintiff is able to

establish the requisite intersection of two factors: a bad act and a bad state of mind." *See Todd v.

Sullivan Const. LLC*, 191 P.3d 196, 201 (2008) (citing *Myers v. Workmen's Auto. Ins. Co.*, 95

P.3d 977, 985 (2004)).

When the moving party's claims are reasonably disputed and there is substantial evidence

that supports the non-moving party's claims, a motion to amend to assert punitive damages may

be compromised.  *See Strong v. Unumprovident Corp.*, 393 F. Supp. 2d 1012, 1026 (D. Idaho

2005) (finding plaintiff had not established reasonable likelihood of proving by preponderance of

evidence[2] "the requisite 'extremely harmful state of mind' and 'extreme deviation from

reasonable standards'" because of conflicting evidence) (citing *Kuntz v. Lamar Corp.*, 385 F.3d

1177, 1187 (9th Cir. 2004)).

---

[2] *Strong* involved Idaho Code section 6-1604's "preponderance of the evidence" standard before its amendment in 2003.  Section 6-1604 now places a higher burden on the moving party, a requirement for "clear and convincing evidence."  *See also* BLACK'S LAW DICTIONARY 596 (8th ed. 2004) ("clear and convincing evidence . . . .  This is a greater burden than preponderance of the evidence . . . .").  The *Strong* standard remains instructive.  That is, if the moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving party's claims, the moving party arguably has not met the "preponderance of the evidence" standard; therefore, the moving party arguably has not met the more stringent "clear and convincing evidence" standard.  *See Stinker*, 2010 WL 1976882 at * 6; *but see Adams v. U.S.*, 622 F. Supp. 2d 996, 1006 (D. Idaho 2009) (rejecting court's interpretation of *Strong* as decision "issued by another judge in this District, and does not accord with this Court's reading of Idaho law.").

**REPORT AND RECOMMENDATION - 5**

Idaho state courts have also made it clear that, with respect to punitive damages, the decision whether to submit the punitive damages question to a jury rests within the sound discretion of the trial court.  *See Manning*, 830 P.2d at 1190 (citing *Hoglan v. First Sec. Bank of Idaho, N.A.*, 819 P.2d 100 (1991)); *Eddins Constr., Inc. v. Bernard*, 806 P.2d 433 (1991).  In this respect, the federal courts are in agreement with Idaho state substantive and procedural law.  *See Foman v. Davis*, 371 U.S. 178 (1962).

Against this backdrop, Plaintiffs allege that Defendant Anthony Vest sold the at-issue lots to Plaintiffs through Defendant Teton Springs Golf & Casting Club, LLC ("Teton Springs"); built the subject homes on these lots through Defendant Headwaters Construction Company; and took a commission on the transactions through Defendant All Seasons Resort Realty, LLC ("All Seasons").  *See* Mem. in Supp. of Pls.' Mot. for Leave to File Pls.' Third Am. Compls., p. 4 (Docket No. 303).

As part of this alleged arrangement, Plaintiffs further allege that Teton Springs hired NuWay Partners ("NuWay") as its "co-broker" and "marketing agent" to market the properties to Plaintiffs.  *See id*.  According to Plaintiffs, NuWay proposed an investment plan whereby, through a series of transactions, Plaintiffs could realize instant equity/profit of upwards of $400,000, with only $2,500 down.  *See id*. at p. 6.  According to Plaintiffs, this was possible only through appraisal reports that had not yet been performed, recognizing that the to-be-built homes were worth far less than the amounts NuWay promised in its "marketing pitch."  *See id*. at pp. 7-8.[3]  Therefore, in the Court's mind, the overall thrust of Plaintiffs' argument to add punitive

---

[3]  Ostensibly to cover the Defendants' tracks, Plaintiffs claim that appraisal reports were later generated in order to convert construction loans to conventional mortgages, using sales comparables, relying on MLS reports (published by All Seasons), of homes sold to "Teton Springs insiders."  *See* Mem. in Supp. of Pls.' Mot. for Leave to File Pls.' Third Am. Compls., pp. 8-10 (Docket No. 303).

**REPORT AND RECOMMENDATION - 6**

damages is premised upon NuWay's conduct in marketing the lots/homes that Plaintiffs' ultimately bought.

Even assuming NuWay was an agent for Teton Springs and/or All Seasons during the relevant time period, NuWay's alleged conduct in support of Plaintiffs' punitive damages argument cannot automatically be considered the conduct of Teton Springs and/or All Seasons. More is needed - namely participation, authorization or ratification on the part of Teton Springs and/or All Seasons.  As the Idaho Supreme Court stated:

> It is settled beyond dispute in Idaho that a principal is liable for punitive damages based on the acts of its agent only in circumstances in which the principal participated, or in which the principal authorized or ratified the agent's conduct.  Furthermore, it is well established that punitive damages may not be assessed against a principal based upon the acts of an agent absent a clear showing of authorization or ratification. . . . .  It is well established that more than an agent's gross negligence is required to hold a principal liable for punitive damages

*See Manning*, 830 P.2d at 1191 (internal citations omitted).  On this point, the parties predictably take opposing positions (in both their briefing and during oral argument).  For example, the parties argue:

<u>All Seasons</u>

•   When the lots first came onto the market, All Seasons worked primarily in the west section of the Mountain Meadows area; in contrast, the Mountain Meadows lots reserved for NuWay were located in the north section.  *See* All Seasons' Mem. in Opp. to Mot. for Leave to File Pls.' Third Am. Compls., p. 2-3 (Docket No. 316);

•   Teton Springs and All Seasons disagreed with NuWay's approach to marketing properties as investments.  *See id*. at p. 3;

•   Neither All Seasons nor Teton Springs had any involvement in the selection of appraisers or, for that matter, any involvement in the appraisal process.  *See id*. at p. 6;

**REPORT AND RECOMMENDATION - 7**

- NuWay did not share commissions owed to All Seasons; instead, All Seasons released lots for sale to NuWay and, in turn, received a lower commission than it would have otherwise received.  *See id*. at pp. 11-12;

- All Seasons had no involvement in either the appraisals or NuWay's marketing techniques.  *See id*. at pp. 14-15;

- Craig Smith of River's Edge Appraisal Service, LLC ("River's Edge") testified that he had no contact with nor was he influenced in any manner by anybody associated with All Seasons in connection with the appraisals.  *See id*. at pp. 15-16; and

- All Seasons had no involvement in NuWay's presentations to its members or NuWay's marketing efforts.  *See id*. at pp. 16-18.

### Teton Springs

- There is no evidence of Teton Springs' knowledge of NuWay and River's Edge's alleged misconduct.  *See* Teton Springs' Mem. in Opp. to Mot. for Leave to File Pls.' Third Am. Compls., p. 5 (Docket No. 317);

- NuWay was not hired as Teton Springs' agent; instead, NuWay was given an opportunity to offer Mountain Meadows lots to its members.  *See id*. at p. 9;

- Teton Springs had no knowledge of NuWay's representations to its members and strictly instructed NuWay that Teton Springs did not sell investments.  *See id*.; and

- Teton Springs and All Seasons had no involvement with the appraisals of the Mountain Meadows properties.  *See id*. at p. 10.

### Plaintiffs

- Mr. Vest, on behalf of both Teton Springs and All Seasons, signed an agreement with NuWay to market the Mountain Meadows properties; NuWay signed the lot sale contracts as "co-broker' with All Seasons; Teton Springs paid NuWay "marketing fees" of approximately $40,000 on each lot sold to Plaintiffs; and NuWay then split its fees with All Seasons.  *See* Reply in Supp. of Pls.' Mot. for Leave to File Pls.' Third Am. Compls., p. 3 (Docket No. 322);

- All Seasons independently marketed the exact "built-in equity" marketing scheme based on faulty appraisals, prior to NuWay's involvement.  *See id*. at p. 4; and

- Teton Springs and NuWay had an ongoing relationship with Eagle River Mortgage, Inc., the entity that processed Plaintiffs' loan applications.  *See id*. at pp. 5-7.

**REPORT AND RECOMMENDATION - 8**

At this motion stage, the Court need not marshal the evidence in the record to determine which party's argument rings true; instead, the point here is to highlight the breadth of arguments relating to Defendants' (and, even, Plaintiffs') alleged conduct.  While Plaintiffs and Defendants attempt to characterize their own, respective conduct in favorable terms (and, conversely, others' conduct in unfavorable terms), the fact-finder may conclude that the truth likely resides somewhere in the middle.  Without so holding here, it is inescapable to the sideline observer that this litigation has the flavor of an unfortunate by-product of various individuals and entities trying to take advantage of an overly optimistic real estate market and, if all went according to everyone's rosy anticipation for the future, whether this action would even exist.

Alas, the answers to such rhetorical questions do not dictate whether a prayer for punitive damages should be included as part of Plaintiffs' claims at this time.  Suffice it to say, even when assuming NuWay was acting as Teton Springs' and All Seasons' agent (and saying nothing of NuWay's apparent relationship to Plaintiffs themselves), there is insufficient evidence in the record establishing a reasonable likelihood of proving by clear and convincing evidence that Teton Springs and All Seasons participated in, authorized, or ratified any conduct considered to be oppressive, fraudulent, malicious, or outrageous (even if damaging) and, therefore, insufficient evidence that Teton Springs or All Seasons performed a set of bad acts with a concurrent bad state of mind.[4]  Said another way, the evidence in the record and arguments of

---

[4]  The Court thus makes no determination as to the application of the Brokerage Representation Act to a claim for punitive damages.  *See, e.g.*, All Seasons' Mem. in Opp. to Mot. for Leave to File Pls.' Third Am. Compls., p. 15 (Docket No. 316) ("Additionally, the Brokerage Representation Act unambiguously abolishes common law agency in regulated real estate transactions such as this. . . . .  The Act also abolishes vicarious liability.").

**REPORT AND RECOMMENDATION - 9**

counsel succeed only in calling into question Defendants' motivations and, as a result, warrants the denial of Plaintiffs' amendment to add a prayer for punitive damages.

This is not to say that Plaintiffs are forever precluded from amending their Complaint to assert a claim for punitive damages. Depending on evidence admitted at trial, Plaintiffs may be permitted to seek an amendment to add a claim for punitive damages in order to conform to that evidence. However, at this stage of the litigation, and based upon the record now before the Court, Plaintiffs' Motion for Leave to File Third Amended Complaints (Docket No. 302) should be denied in this respect.

B.      FRCP 15(a) v. FRCP 16(b):  Amendments Under Federal Law

Plaintiffs seek to amend their Complaints to include claims for gross negligence and negligence per se under FRCP 15(a). *See* Mem. in Supp. of Pls.' Mot. for Leave to File Pls.' Third Am. Compls., p. 12 (Docket No. 303). Generally, a motion to amend is analyzed under FRCP 15(a) as Plaintiffs suggest, with leave to amend being "freely given when justice so requires." *See* Fed. R. Civ. P. 15(a)(2); *see also AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946 (9th Cir. 2006). However, where a party seeks to amend a pleading after the deadline to amend pleadings set forth in the court's scheduling order has passed, FRCP 16(b)'s "good cause" standard applies. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

The relevant inquiry under FRCP 16(b) focuses on the diligence of the party seeking the amendment - not any potential prejudice to the opposing party. *See Robinson v. Twin Falls Highway Dist.*, 233 F.R.D. 670, 672 (D. Idaho 2006) (citing *Johnson*, 975 F.2d at 609). In other words, the Court must evaluate "the moving party's diligence in attempting to meet the case

**REPORT AND RECOMMENDATION - 10**

management order's requirements." *See Robinson*, 233 F.R.D. at 672 (quoting *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001)).  Having said this, any prejudice to the opposing party can be an *additional* reason to deny a motion to amend, but it is not the main focus of the Court's inquiry.  *See Robinson*, 233 F.R.D. at 672 (citing *Johnson*, 975 F.2d at 609).  Simply put, if the moving party was not diligent, the inquiry should end.

Here, while arguing within an inapplicable context (FRCP 15(a) instead of FRCP 16(b)), Plaintiffs still claim that "[t]he proposed amendment will bring neither undue delay nor prejudice to Defendants."  *See*  Mem. in Supp. of Pls.' Mot. for Leave to File Pls.' Third Am. Compls., p. 13 (Docket No. 303).  Plaintiffs' argument misses the point as it not only ignores Judge Winmill's October 6, 2008 Case Management Order and its corresponding December 29, 2008 amendment deadline (Docket No. 113), but also does not clearly address their own *diligence*  in seeking to add more claims - the relevant inquiry at this point.  During oral argument, Plaintiffs' counsel appeared to premise Plaintiffs' delinquent amendments on the need to gauge the consistency of Paul Maples' testimony while under oath during his deposition.  Mr. Maples, however, is a *named* Plaintiff in this action.  There should be no reason or need to delay a claim/amendment, awaiting the deposition of one's own client; such information is (and always has been) available to Plaintiffs' counsel through their communications with each other.

Over Defendants' objections, Plaintiffs were previously allowed an amendment after the December 29, 2008 deadline.  Plaintiffs' quest for a third amendment -months after the deadline - is without good cause under FRCP 16(b).  Notwithstanding the timing of Mr. Maples' deposition, Plaintiffs' offer no compelling reason why they could not have previously asserted gross negligence and negligence per se claims against Defendants.  Instead, these claims appear

**REPORT AND RECOMMENDATION - 11**

to be afterthoughts, responding to Defendants' arguments against the availability of punitive

damages.  It is therefore recommended that Plaintiffs' Motion for Leave to File Third Amended

Complaints (Docket No. 302) be denied in this respect.[5]

## II.    Motions for Partial Summary Judgment

### A.    Summary Judgment Standard of Review

Summary judgment is used "to isolate and dispose of factually unsupported claims . . . ."

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural

_____

    [5]  It should also be mentioned that All Seasons' Motion to Dismiss Plaintiffs' Sixth Cause of Action (Docket No. 210) warrants some final resolution here.

    On June 8, 2009, All Seasons moved to dismiss Plaintiffs' negligent misrepresentation claim, arguing that "Idaho does not recognize negligent misrepresentation in this context."  *See* All Seasons' Mem. in Supp. of Mot. to Dismiss, p. 2 (Docket No. 210, Att. 1).  Plaintiffs then moved for leave to file their Second Amended Complaint (Docket No. 220) which Judge Winmill granted (Docket No. 268).  As its sixth cause of action, Plaintiffs' Second Amended Complaint states a negligence claim, not a negligent misrepresentation claim.  This Court issued a DEO on August 27, 2009, requesting the parties' input as to the status of All Seasons' Motion in light of Judge Winmill's ruling (Docket No. 278).  In response, All Seasons argued that their Motion was not moot, claiming that the allegations supporting Plaintiffs' negligence claim nonetheless "describe a claim which is based on negligent misrepresentation."  *See* All Seasons' Resp. (Docket No. 281).  Plaintiffs did not respond; however, Plaintiffs moved for leave to file their Third Amended Complaint on October 2, 2009 (Docket No. 302).  Again, the proposed Third Amended Complaint has no negligent misrepresentation claim, only negligence, negligence per se, and gross negligence claims.  Once again, All Seasons opposed these amendments as negligent misrepresentation claims in disguise.  *See* All Seasons' Mem. in Opp. to Mot. for Leave to File Pls.' Third Am. Compls., pp. 19-20 (Docket No. 316).  The Court is unaware of any written response from Plaintiffs to All Seasons' specific negligent misrepresentation vs. negligence arguments.

    In its July 6, 2010 Memorandum Decision and Order, the undersigned requested that All Seasons and Plaintiffs be prepared to discuss this issue.  Following oral argument, the Court finds that Plaintiffs' allegations of negligence against All Seasons and its related parties (*see* Pls.' Second Am. Compl. at ¶ 6.59 (Docket No. 218) ("[All Seasons] published information they knew or should have known was false . . . . [All Seasons] published these sham sales and sales based on sham sales and MLS reports, which also negligently inflated the market value of the Teton Springs home") amount to allegations of negligent misrepresentation.  Absent any focused response from Plaintiffs on this point, and understanding that Idaho does not recognize such a claim in this setting, Plaintiffs' negligence claim against All Seasons (within their sixth cause of action in their Second Amended Complaint) should be dismissed.

**REPORT AND RECOMMENDATION - 12**

shortcut," but is instead the principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *See id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

However, the evidence, including all reasonable inferences which may be drawn therefrom, must be viewed in a light most favorable to the non-moving party (*see id*. at 255) and the Court must not make credibility findings.  *See id*.  Direct testimony of the non-movant must be believed, however implausible.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor.  *See Anderson*, 477 U.S. at 256-57.  The non-moving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists.  *See Celotex*, 477 U.S. at 324.  However, the Court is "not required to comb through the record to find some

**REPORT AND RECOMMENDATION - 13**

reason to deny a motion for summary judgment." *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)).  Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *See Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).  A statement in a brief, unsupported by the record, cannot be used to create an issue of fact. *See Barnes v. Independent Auto. Dealers*, 64 F.3d 1389 n. 3 (9th Cir. 1995).

Here, there are five pending motions for partial summary judgment.  The standard of review identified above will be applied to each motion.

B.  <u>Plaintiffs' Motion for Partial Summary Judgment (Agency) (Docket No. 307)</u>

Plaintiffs ask this Court to establish as a matter of law the agency relationship between Teton Springs and NuWay. *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Agency), p. 1 (Docket No. 307-Att. 1).  In their moving paperwork, Plaintiffs originally rely on Idaho common law when arguing in favor of an express, implied, and apparent agency relationship between Teton Springs and NuWay. *See id*. at pp. 4-5.  To this end, Plaintiffs claim that (1) the agreement between Teton Springs and NuWay to sell Mountain Meadows properties amounts to NuWay's *express*, contractual authority to act on Teton Springs' behalf (*see id*. at pp. 5-8); (2) the reference to NuWay as a "co broker" on the lot sale contracts to plaintiffs *expressly* establishes an agency relationship between Teton Springs and NuWay (*see id*. at pp. 8-9); (3) NuWay exercised *implied* authority from Teton Springs in marketing the Mountain Meadows subdivision to Plaintiffs (*see id*. at p. 10); and (4) the lot sale contracts created *apparent* authority in NuWay to act as Teton Springs' agent (*see id*. at pp. 10-11).

**REPORT AND RECOMMENDATION - 14**

In response, Teton Springs asserts that Plaintiffs' common law agency and vicarious liability arguments are abrogated by the more recent Idaho Real Estate Brokerage Representation Act (the "Act").  *See* Opp. to Pls.' Mot. for Partial Summ. J. (Agency), pp. 5-6 (Docket No. 330) ("Through the Act, the legislature abolished common law agency in regulated transactions such as those involved in this case.").  The Act states:

> A buyer or seller is not represented by a brokerage in a regulated real estate transaction unless the buyer or seller and the brokerage agree, in a separate written document, to such representation.  No type of agency representation may be assumed by a brokerage, buyer or seller or created orally or by implication.

*See* I.C. § 54-2084(1).  Teton Springs, in turn, argues that neither (1) the underlying agreement between Bond Realty (NuWay's predecessor of sorts) and Teton Springs, (2) the subsequent agreement between Teton Springs and NuWay to sell Mountain Meadows properties, nor (3) the lot sale contracts create an agency relationship between Teton Springs and NuWay under the Act.  *See* Opp. to Pls.' Mot. for Partial Summ. J. (Agency), pp. 8-12 (Docket No. 330).

Plaintiffs reply that the Act is inapplicable because this action does not involve regulated real estate transactions, conducted by real estate brokers and salespersons licensed by the Idaho Real Estate Commission.  *See* Reply in Supp. of  Pls.' Mot. for Partial Summ. J. (Agency), p. 3 (Docket No. 347) (citing I.C. § 54-2002).[6]  Nonetheless, Plaintiffs once again point to Teton Springs' and NuWest's agreement to market and sell Mountain Meadows properties as establishing an agency relationship between the two under either the Act or Idaho common law. *See id*. at pp. 4-5.

---

[6]  Interestingly, however, the focus of Plaintiffs' oral argument and PowerPoint presentation on the alleged agency relationship between Teton Springs and NuWay (and, even, subsequent briefing) relied upon the Act's application, namely sections 54-2084, 54-2050, 54-2085, 54-2091, and 54-2093.

**REPORT AND RECOMMENDATION - 15**

It is true that, in Idaho, the existence of an agency relationship is often considered a question of fact.  *See, e.g.*, *Hausam v. Schnabl*, 887 P.2d 1076, 1079 (1994) ("The existence of an agency relationship is a question for the trier of fact to resolve from the evidence."). Regardless of whether the Act or common law applies here, it is apparent that any alleged agency relationship between Teton Springs and NuWay turns on the agreements and/or contracts entered into by those parties themselves.  An examination of such materials, however, does not offer an immediately clear understanding of any agency relationship, particularly given the parties' conflicting interpretations of what these documents actually portray.  For example:

- Plaintiffs point out that the Teton Springs/NuWay agreement to market and sell Mountain Meadows properties (attached as p. 6 to Ex. 2 to McLean Aff. at ¶ 6 (Docket No. 307, Att. 5)) discussed a "marketing fee" payable from Teton Springs to NuWay, giving NuWay the authority to market and sell the Mountain Meadows on Teton Springs' behalf.  *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Agency), pp. 6-8 (Docket No. 307-Att. 1); *see also* Reply in Supp. of  Pls.' Mot. for Partial Summ. J. (Agency), pp. 4-5 (Docket No. 347).[7]

- Teton Springs disagrees, arguing that the lot sale contracts (attached as pp. 34-48 to Ex. V3 to Vest Decl. at ¶ 23 (Docket No. 331, Att. 1)) entered into while the underlying Teton Springs/Bond Realty agreement was in effect (attached as p. 1 to Ex. 2 to McLean Aff. at ¶ 6 (Docket No. 307, Att. 5)) show that "Bond Realty [and, thus, later, NuWay] is acting as an agent for the Buyer(s)."  *See* Opp. to Pls.' Mot. for Partial Summ. J. (Agency), pp. 8-9 (Docket No. 330).  Moreover, Teton Springs claims that the the Teton Springs/NuWay agreement acknowledges NuWay as "a normal outside broker" and not an agent, while specifically allowing for a $3,000 payment to All Seasons for its "full agency assistance."  *See id*. at p. 14.  According to Teton Springs, "it would defy logic to accept that NuWay agreeing to pay Teton Springs Realty for Teton Springs Realty's 'full agency assistance' somehow establishes an agency relationship between Teton Springs (the seller) and NuWay."  *See* Opp. to Pls.' Mot. for Partial Summ. J. (Agency), p. 12 (Docket No. 330).

---

[7] During oral argument, Plaintiffs counsel also compared the terms of the Teton Springs/NuWay agreement against Idaho Code section 54-2050(1)'s requirements for a seller representation agreement, arguing that the existence of (1) a beginning and ending term; (2) a description of the property to be bought and sold; (3) the price terms; (4) fees or commissions; and (5) the pertinent signatures in the agreement amounted to a seller representation agreement, thereby establishing an agency relationship between Teton Springs and NuWay.

**REPORT AND RECOMMENDATION - 16**

- Plaintiffs argue that, on each lot sale contract, NuWay is listed as Teton Springs' "co broker" and is, therefore, an agent standing in a fiduciary relation to Teton Springs. *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Agency), p. 8 (Docket No. 307-Att. 1).

- Teton Springs considers such language immaterial, stating: "[a]ssuming arguendo NuWay was expressly acting as agent for the *buyers*, it would still be a 'co-broker'", pointing, again, to the lot sale contract, signed by Plaintiff Paul Maples, where Bond Realty (and, by later implication, NuWay) is acting as the buyer's agent. *See* Opp. to Pls.' Mot. for Partial Summ. J. (Agency), pp. 6-7 (Docket No. 330).

During oral argument, the Court spent a considerable amount of time with Teton Springs' counsel on the characterization of NuWay's relationship to Teton Springs, flowing from the prior alleged bulk sale contract between Teton Springs and Bond Realty. Through this exchange, the Court understood that none of the Plaintiffs purchased their lots from NuWay but, rather, purchased their lots directly from Teton Springs.[8] This reality confirms in the Court's mind that NuWay, acting as a "middleman" for these transactions, was, at the very least, Teton Springs' agent when it came to marketing these lots to Plaintiffs. The Court is satisfied that, based upon the record, reasonable minds cannot differ on this discrete point. Yet, in so deciding, the Court is not ruling as a matter of law that Teton Springs, as a principal, bears ultimate responsibility for conduct it contends exceeded the scope of such a relationship.[9] As to the full scope of NuWay's

---

[8]  However, during the hearing, Teton Springs' counsel did point out that NuWay itself, at the "tail end of the contract", purchased 42 lots from Teton Springs. Again, these lots are distinct from the lots Plaintiffs' purchased.

[9]  Additionally, there is some dispute concerning whether the Act abolishes vicarious liability. *See, e.g.*, Opp. to Pls.' Mot. for Partial Summ. J. (Agency), pp. 12-13 (Docket No. 330) ("[E]ven if the Court were to accept the Plaintiffs' allegations of agency, an order conclusively establishing agency for trial is inappropriate under the [Act] because the Act abolishes vicarious liability for the acts of agents in regulated real estate transactions."). To be clear, Idaho Code section 54-2093 generally does away with vicarious liability unless a client (whether buyer or seller) or a licensee or brokerage engaged in representation of a client "had actual knowledge of or reasonably should have known of the wrongful act, error, omission or misrepresentation." *See* I.C. §§ 54-2093(1) & (2). Whether such circumstances exist here, again, is unclear in that it relates to what Teton Springs knew or should have known - a question squarely within the province of the fact-finder and inappropriate for resolution at this time as a matter of law.

**REPORT AND RECOMMENDATION - 17**

authority, a battleground of competing arguments exists (applicable to either the Act or Idaho common law, as the case may be) that, based upon the record now before this Court, cannot be reconciled via summary judgment.  As a consequence, it is hereby recommended that Plaintiffs' Motion for Partial Summary Judgment (Agency) (Docket No. 307) be granted in part and denied in part, consistent with the foregoing rationale.

      C.    <u>Plaintiffs' Motion for Partial Summary Judgment (Affirmative Defenses)<br>(Docket No. 325)</u>

Through a separate motion for summary judgment, Plaintiffs confront three of All Seasons' affirmative defenses: (1) assumption of risk; (2) "administrative collateral estoppel/res judicata"; and (3) "limitation of liability by virtue of the purported lot sale contracts".  *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), pp. 1-2 (Docket No. 326).

      *1.*    *Assumption of Risk*

All Seasons argues that the lot sale contracts themselves (apparently signed by all but two Plaintiffs) and Exhibit C to these lot sale contracts (apparently signed by all Plaintiffs, except Paul Maples), indicate Plaintiffs' acquiescence to the whims of the real estate market with respect to the investment potential or resale value of the purchased properties.  *See* Opp. to Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 4 (Docket No. 337) ("In this case, through the lot sale contracts Plaintiffs have expressly assumed the risk of any investment losses or the failure of the properties to appreciate as they had hoped.").

According to Plaintiffs, Idaho's comparative fault statute supplants assumption of risk as an affirmative defense.  *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 3 (Docket No. 326) ("As assumption of the risk has been abrogated by the

**REPORT AND RECOMMENDATION - 18**

comparative fault statutory scheme, Plaintiffs request that this Court strike the All Seasons Defendants' assumption of the risk affirmative defense as a matter of law.") (citing *Salinas v. Vierstra*, 695 P.2d 369 (Idaho 1985)).  Absent the availability of an assumption of risk defense to All Seasons, Plaintiffs argue for the defense's dismissal.

While Plaintiffs correctly point out the potential inconsistencies between Idaho's comparative fault statute and the doctrine of assumption of risk, the Court is not convinced that any technical mischaracterization[10] of the defense automatically amounts to a waiver of that substantive defense - particularly when Plaintiffs are aware of the type of defense that is being offered.  The Court will not elevate hypertechnical form over substance.  Therefore, the Court recommends that Plaintiffs' Motion for Partial Summary Judgment (Affirmative Defenses) (Docket No. 325) be denied in this respect.[11]

### 2.    *Collateral Estoppel and/or Res Judicata*

Plaintiffs next take issue with All Seasons' attempt to raise collateral estoppel and res judicata as affirmative defenses, stating that, for either defense to apply, All Seasons must prove (among other things) that there was a final judgment on the merits in a prior litigation.  *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), pp. 3-4 (Docket No. 326).  However, according to Plaintiffs, "the only claim or issue that could possibly provide the basis for a res judicata or collateral estoppel defense is Plaintiffs' prior dismissal, without

---

[10]  The Court is not holding here that All Seasons is, in fact, mischaracterizing its defense as "assumption of risk".  Any corresponding issue regarding how such a defense is presented to a jury is to be taken up with U.S. District Judge Edward J. Lodge at trial.

[11]  In making this finding, the undersigned is not saying that assumption of risk actually applies or, if so, the extent of its application to Plaintiffs' claims.

**REPORT AND RECOMMENDATION - 19**

prejudice, of Ms. Anderson in the *Hamabe* matter" and "[s]ince the dismissal was without prejudice, it cannot be a 'final judgment on the merits.'" *See id*. at p. 4.

All Seasons finds Plaintiffs' argument misplaced, pointing out that Plaintiffs "fail[ed] to recognize the affirmative defense pled by the defendants was 'administrative collateral estoppel or res judicata' which, by its description is based upon an administrative proceeding rather than a court action." *See* Opp. to Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 13 (Docket No. 337). All Seasons goes on to discuss that Plaintiffs filed a complaint with the Department of Housing and Urban Development ("HUD"), alleging violations of the Interstate Land Sales Full Disclosure Act and that its resolution "can bar those particular plaintiffs from re-litigating issues considered and determined by the administrative agency." *See id*. at pp. 13-14.

Even though Idaho courts may not have expressly recognized the use of *administrative* collateral estoppel, as Plaintiffs suggest (*see* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 3, n. 1 (Docket No. 326); *see also* Reply in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 7 (Docket No. 348)), that does not mean that the defense is not available to All Seasons - particularly when considering that such an issue may never have presented itself to an Idaho appellate court.[12]   Regardless, under Ninth Circuit precedent, for administrative collateral estoppel to exist, an "adequate opportunity to litigate" must have taken place in the administrative context. *See* Reply in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 7 (Docket No. 348) (citing *Wehrli v. County of Orange*, 175 F.3d 692, 695 (9th Cir. 1999)).   According to Plaintiffs, "there was no opportunity to litigate

---

[12]   Indeed, Plaintiffs state that "[a] diligent search did not reveal any Idaho authority even mentioning 'administrative collateral estoppel.'" *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 3, n. 1 (Docket No. 326).

**REPORT AND RECOMMENDATION - 20**

[HUD's] finding regarding the Interstate Land Sale Full Disclosure Act[;] [HUD] merely unilaterally reached its decision." *See* Reply in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 7 (Docket No. 348).

The record is simply too incomplete to determine whether All Seasons' affirmative defense of administrative collateral estoppel applies here. Still, the Court will not strike the defense outright, given (1) its application within Ninth Circuit case law, and (2) the absence of any Idaho authority specifically to the contrary. Therefore, the Court recommends that Plaintiffs' Motion for Partial Summary Judgment (Affirmative Defenses) (Docket No. 325) be denied in this respect.[13]

### 3. *The Lot Sale Contracts' Alleged Limitation of Liability*

Looking at Exhibit C to the lot sale contracts, Plaintiffs argue that (1) its language represents a disfavored exculpatory clause that does not apply to the claims pending against All Seasons, and (2) All Seasons is not a party to the lot sale contracts and, therefore, cannot benefit from any protections within Exhibit C. *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), pp. 5-7 (Docket No. 326). These challenges are without merit.

### a. **Exhibit C is Not an Exculpatory Clause**

Exhibit C to the lot sale contracts states:

> The buyer understands that Teton Springs Golf & Casting Club, LLC and Teton Springs Realty, LLC sell resort real estate and club memberships and do not sell investments in any form and do not represent that any property will generate income or appreciation. The buyer agrees to hold Teton Springs Golf & Casting Club, LLC and

---

[13] In making this finding, the undersigned is not saying that collateral administrative estoppel actually applies or, if so, the extent of its application to Plaintiffs' claims.

Teton Springs Realty, LLC, their employees, agents and owners harmless from any claims of investment losses by the buyer.

*See* Stmt. of Undisp. Facts, ¶¶ 7-8 (Docket No. 338, Att. 5); *see also* p. 47 of Ex. A to Collaer Aff., ¶ 2 (Docket No. 338, Att. 6). The Court concludes that Exhibit C does not constitute an exculpatory clause in the classic sense. That is, Exhibit C does not attempt to limit the causes of action a buyer can bring; instead, following an acknowledgment from the buyer as to the investment capabilities of the property purchased, Exhibit C attempts to limit the buyer's investment-related damages correspondingly. This distinction sets Exhibit C apart from the cases Plaintiffs rely upon.[14] Therefore, the Court recommends that Plaintiffs' Motion for Partial Summary Judgment (Affirmative Defenses) (Docket No. 325) be denied in this respect.[15]

**b.      All Seasons is a Third-Party Beneficiary to the Lot Sale Contracts**

In order to enjoy contractually exculpated liability, the party seeking to limit liability must be a party to the contract or a primary third-party beneficiary. *See id*. at p. 6 (citing *Anderson & Nafziger v. G.T. Newcomb, Inc.*, 595 P.2d 709, 712 (Idaho 1979)). Being a party to contract is self-evident; to be a third-party beneficiary, the contract must be made expressly for the benefit of that third person. *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), pp. 6-7 (Docket No. 326) (citing *Idaho Power Co. v. Hulet*, 90 P.3d 335,

---

[14]  Moreover, in response to All Seasons' "limitation of remedies" argument, Plaintiffs state that "such clauses are not enforceable if they are the product of fraud." *See* Reply Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 6 (Docket No. 348). This is necessarily a fact-intensive inquiry (as is whether the exceptions to an otherwise valid exculpatory clause exist (*see* Opp. to Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), pp. 11-12 (Docket No. 337)), further endorsing the denial of Plaintiffs' summary judgment attempt here.

[15]  In making this finding, the undersigned is not saying that Exhibit C actually applies to the relief Plaintiffs' seek.

**REPORT AND RECOMMENDATION - 22**

337 (Idaho 2004)); *see also* Opp. to Pls.' Mot. for Partial Summ. J. (Affirmative Defenses), p. 6

(Docket No. 337) (citing I.C. § 29-102 ("The contract, made expressly for the benefit of a third

person, may be enforced by him at any time before the parties thereto rescind it.")).

Here, there is no dispute that All Seasons did not sign the lot sale contracts.

Additionally,   while All Seasons is not referenced within Exhibit C, its predecessor, Teton

Springs Realty, LLC is referenced twice.  *See supra* at pp. 21-22.  In 2007, without forming a

new business entity, Teton Springs Realty, LLC apparently became All Seasons; in other words,

according to All Seasons, Teton Springs Realty, LLC *is* All Seasons.  *See*  Opp. to Pls.' Mot. for

Partial Summ. J. (Affirmative Defenses), p. 8 (Docket No. 337).[16]  Exhibit C, then, would appear

to express an intent to benefit All Seasons and, as a consequence, promote All Seasons to third-

party beneficiary status.  Therefore, the Court recommends that Plaintiffs' Motion for Partial

Summary Judgment (Affirmative Defenses) (Docket No. 325) be denied in this respect.[17]

    D.    <u>All Seasons' Motion for Partial Summary Judgment (Investment Losses)</u>
        <u>(Docket No. 338)</u>[18]

Consistent with its response to Plaintiffs' attack on their affirmative defenses, All

Seasons counter-argues that Plaintiffs have, through the lot sale contracts (1) assumed the risk of

investment losses and (2) agreed to limit their remedies by holding Teton Springs and All

[16]  Even in their pleading caption, Plaintiffs identify All Seasons as "f/k/a Teton Springs Realty, LLC."  *See, e.g.*, Hamabe Pls.' Second Am. Compl. and Demand for Jury Trial (Docket No. 218); *see also* Read Pls.' Second Am. Compl. and Demand for Jury Trial (Docket No. 219).

[17]  Again, in making this finding, the undersigned is not saying that Exhibit C to the lot sale contracts actually applies to the relief Plaintiffs' seek.

[18]  Teton Springs' Motion for Partial Summary Judgment and Joinder (Docket No. 344) speaks in large part to the same issues raised within All Seasons' Motion for Partial Summary Judgment (Investment Losses) (Docket No. 338).  Therefore, the Court's consideration of All Seasons' Motion for Partial Summary Judgment (Investment Losses) (Docket No. 338) applies equally to Teton Springs' Motion for Partial Summary Judgment and Joinder (Docket No. 344), unless otherwise stated.

Seasons harmless for any investment losses they may experience.  *See*  Mem. in Supp. of All

Seasons' Mot. for Partial Summ. J. (Investment Losses), p. 2 (Docket No. 338, Att. 1) ("With the

exception of two of the parties, all of the plaintiffs entered into written contracts containing

provisions assuming the risk of investment losses and agreeing that any remedies they might

have against Teton Springs and the All Season Defendants could not include investment losses

or damages associated with the fact their properties did not appreciate in value.").  Alternatively,

All Seasons contends that Plaintiffs' ability to recover purely economic losses in tort is limited

by Idaho's economic loss rule.  *See* Mem. in Supp. of All Seasons' Mot. for Partial Summ. J.

(Investment Losses), p. 8 (Docket No. 338, Att. 1).

> 1.     *Assumption of Risk*

According to All Seasons, "each of the lot sale contracts contained a clause [Paragraph

29] whereby the plaintiffs, as buyers, agreed to assume the risk of any damages they may incur

surrounding the investment potential or resale value of the property."  *See id*. at p. 4.  Paragraph

29 of the lot sale contracts states:

> Disclaimer: Seller and Purchaser acknowledge that they have not
> relied upon the advice or representation, if any, of Broker (or
> Broker's associated salespersons) relative to any consequences of this
> Contract and the sale of the Property, the condition of the Property,
> the availability of utilities to the Property, or the investment potential
> or resale value of the Property.   Seller and Purchaser both
> acknowledge that if such matters are of concern to them, they have
> sought and obtained independent advice.  Purchaser acknowledges
> that Broker (or Broker's associated salesperson) are representatives
> of the Seller and are not acting by or for Purchaser in any capacity.

*See* Stmt. of Undisp. Facts, ¶¶ 5-6 (Docket No. 338, Att. 5); *see also* pp. 41-42 of Ex. A to

Collaer Aff., ¶ 2 (Docket No. 338, Att. 6).  All Seasons argues that Paragraph 29 represents "a

classic example of an individual contractually assuming the risk of an event  which may or may

**REPORT AND RECOMMENDATION - 24**

not occur in the future" and that, "[b]ecause the properties lost value after the plaintiffs completed their purchases, those losses are risks the plaintiffs, through their contract, agreed to assume." *See* Mem. in Supp. of All Seasons' Mot. for Partial Summ. J. (Investment Losses), p. 6 (Docket No. 338, Att. 1).

While not necessarily denying that they assumed the risk of legitimate investment losses (whatever that term may mean (*see infra* at p. 28), Plaintiffs instead argue that All Seasons cannot perform an end-run around its own allegedly tortious conduct and failures to disclose through a paragraph in the lot sale contracts that merely memorializes the parties' apparent understanding of the properties' investment potential. *See* Opp. to All Seasons' Mot. for Partial Summ. J. (Investment Losses), pp. 7-12 (Docket No. 364). To this end, Plaintiffs assert that All Seasons breached common law and statutory duties and that Paragraph 29 does not amount to Plaintiffs' assumption of the risks associated with *those* alleged breaches of duty. *See id*. at pp. 12-13.

In reading Paragraph 29, the Court concludes that it may not be as encompassing as All Seasons understandably wants it to be. First, it is questionable whether the language within Paragraph 29 represents an assumption of risk with respect to *anything*, let alone investment losses (although that is admittedly possible). What is clear, however, is that Paragraph 29 seeks to (and does) affirm the nature of representations made between parties and, likewise, the reliance (or lack of reliance) on those representations when entering into a contract to purchase property. Second, even when assuming that Paragraph 29 constitutes Plaintiffs' assumption of risk of investment losses generally, it cannot be said that such an assumption of risk operates to ignore subsequently-revealed breaches of duties that nonetheless may relate to investment losses (again, whatever that term may mean). This represents the core of Plaintiffs' opposition to All

**REPORT AND RECOMMENDATION - 25**

Seasons' summary judgment arguments and, keeping in mind that all inferences are to be made in Plaintiffs' favor, the Court cannot decide as a matter of law that Plaintiffs assumed the risks of what ultimately (and allegedly) transpired when purchasing properties in the Mountain Meadows subdivision.  Therefore, the Court recommends that All Seasons' Motion for Partial Summary Judgment (Investment Losses) (Docket No. 338) be denied in this respect.[19]

        2.      *Limitation of Remedies*

Exhibit C to the lot sale contracts states that (1) Teton Springs and Teton Springs Realty, LLC (and, hence, All Seasons) "do not sell investments in any form and do not represent that any property will generate income or appreciation"; and (2) the buyer agrees to hold Teton Springs and Teton Springs Realty, LLC (and, hence, All Seasons) "harmless from any claims of investment losses by the buyer."  *See supra* at pp. 21-22.  In characterizing Plaintiffs' losses as "investment losses" (*see* Mem. in Supp. of All Seasons' Mot. for Partial Summ. J. (Investment Losses), p. 2 (Docket No. 338, Att. 1) ("As part of their complaint, the plaintiffs seek investment losses allegedly caused by the purchase of their properties.")), All Seasons goes on to argue that Plaintiffs "agreed to indemnify the All Season defendants as well as Teton Springs for any claims of investment losses . . . ." and, as a result, "all claims in the second amended complaint seeking recovery for investment losses should be dismissed."  *See id*. at p. 13.

In response, Plaintiffs argue that any limitation of remedies defense fails because (1) limiting Plaintiffs' damages and/or indemnifying All Seasons for its own negligence, effectively amounts to an abrogation of duties in a manner prohibited under Idaho Code section 54-2086,

---

      [19]  Again, All Seasons is permitted to raise its assumption of risk defense at trial, the extent of its application, if any, however, is beyond this Court's consideration at this time.  *See supra* at p. 19, n. 10.

and (2) Plaintiffs are not seeking "investment losses."  *See* Opp. to All Seasons' Mot. for Partial

Summ. J. (Investment Losses), pp. 7-13 (Docket No. 364).  Resolution of this second point does

not require consideration of the first; that is, the Court cannot hold as a matter of law (as it must

if it grants All Seasons' relief) that the damages claimed by Plaintiffs are unequivocally

considered to be "investment losses" as that term is used within Exhibit C to the lot sale

contracts.

     Whether legitimate or merely in response to All Seasons' briefing,[20] Plaintiffs contend

that their damages are not premised on the real estate market over time (in which case, those

damages would properly be considered "investment losses") but, rather, are a function of the

alleged misrepresentations concerning the true, initial value of the lots at the time they were

purchased - even if purchased as an investment and not as a second home.  *Cf.* Opp. to All

Seasons' Mot. for Partial Summ. J., p. 13 (Docket No. 364) ("Defendants' assumption of the risk

argument assumes that the Mountain Meadows homes were, in fact, worth over $1,000,000 to

begin with, and then proceeded to lose investment value. . . . .  The homes were never worth the

sale or appraised value."); *see also id*. at p. 18 ("Plaintiffs are claiming that the houses were

worth hundreds of thousands of dollars less than what was told to them by Defendants in order to

induce the sale. . . . .  Thus, as ambiguous as the 'investment loss' term is, it cannot be enforced

as it implies that the homes were, in fact, worth $1,350,000 to $1,400,000 to begin with").

---

[20]  On this point, the Court notes that, since All Seasons filed its Motion for Partial
Summary Judgment (Investment Losses) (Docket No. 338), Plaintiffs have "supplemented" their
FRCP 26 Disclosures with respect to their damages calculation (*see* Ex. 1 to McLean Aff. at ¶ 4
(Docket No. 389, Att. 1)).

**REPORT AND RECOMMENDATION - 27**

Unfortunately, "investment losses" are not defined in the lot sale contracts.[21]  Although it is indeed possible to view the damages sought by Plaintiffs through the lenses of All Seasons arguments, the Court must view the evidence, including all reasonable inferences which may be drawn therefore, in Plaintiffs' favor.  Doing so creates an issue of fact as to, first, the meaning of investment losses within Exhibit C to the lot sale contracts and, second, whether Plaintiffs damages constitute such investment losses under Exhibit C.  Therefore, the Court recommends that All Seasons' Motion for Partial Summary Judgment (Investment Losses) (Docket No. 3338) be denied in this respect.

### 3.   *Economic Loss Rule*

The economic loss rule itself is not in dispute.  Further, the parties agree that there are two exceptions to the economic loss rule: the existence of a special relationship between the parties and unique circumstances requiring a reallocation of the risk.  As All Seasons correctly notes, Idaho cases have not found a typical real estate deal as presenting a unique circumstance (*see* Reply in Supp. of All Seasons' Mot. for Partial Summ. J., p. 10 (Docket No. 373)) and this Court agrees.  All Seasons also argues that there is no special relationship between it and Plaintiffs, because Plaintiffs were not represented by All Seasons.  *See id.*

A "special relationship" refers to situations where the relationship between the parties is such that it would be equitable to impose a duty to prevent economic loss to another.  *See Duffin*

---

[21]  During oral argument, Plaintiffs' counsel appropriately pointed out that, while not defined in the lot sale contracts, Exhibit C itself seems to associate investment losses with a depreciation in value over time by stating that Defendants "do not sell investments in any form and do not represent that any property will generate income or appreciation."  *See* Stmt. of Undisp. Facts, ¶¶ 7-8 (Docket No. 338, Att. 5); *see also* p. 47 of Ex. A to Collaer Aff., ¶ 2 (Docket No. 338, Att. 6) (emphasis added).

**REPORT AND RECOMMENDATION - 28**

*v. Idaho Crop Improvement Association*, 895 P.2d 1195, 1201 (Idaho 1995). The Idaho Supreme

Court has recognized two situations in which the "special relationship" exception applies - first,

where a professional or quasi-professional performs personal services; second, where an entity

holds itself out to the public as having expertise regarding a specialized function and knowingly

induces reliance on its performance. *See Millenkamp v. Davisco Foods Intern., Inc.*, 391 F.

Supp. 2d 872, 878-79 (D. Idaho 2005). The parties, however, cite no cases (and this Court finds

none) discussing the economic loss rule's application vis a vis the Act - the Idaho Brokerage

Representation Act - and Idaho Code section 54-2086.[22]

During oral argument, All Seasons pointed out that Plaintiffs were not its client but,

rather, its customer. Idaho Code section 54-2086 identifies the duties and obligations owed to a

customer. *See* I.C. § 54-2086(1); *see also* I.C. § 54-2086(3) ("The duties set forth in this section

are mandatory and may not be waived or abrogated, either unilaterally or by agreement."). It is

unclear to the Court whether the duties/obligations referenced within the Act exist to create a

special relationship between All Seasons and Plaintiffs. Moreover, it would seem inconsistent

for a Court to apply the economic loss rule in a way that precludes tort claims (arising out of an

alleged breach of these statutory duties) for the economic losses that naturally flow out of real

estate transactions. *See* Opp. to All Seasons' Mot. for Partial Summ. J. (Investment Losses), p.

15 (Docket No. 364) ("The Idaho Legislature would not impose specific duties upon real estate

brokers and agents while precluding redress for the breach of those duties through application of

---

[22]   All Seasons did reference two cases - *Graefe v. Vaughn*, 972 P.2d 317 (Idaho Ct. App.
1999) and *Blahd v. Richard B. Smith, Inc.*, 108 P.3d 996 (Idaho 2005) - that, according to All
Seasons' counsel during oral argument, straddled the passage of the Act. Even though the cases
may have reached similar conclusions, neither discussed the effect of the Act or the interplay of
the duties identified therein with respect to the economic loss rule and its "special relationship"
exception.

**REPORT AND RECOMMENDATION - 29**

the 'economic loss rule.'  The provisions of and duties imposed by Idaho Code § 54-2086 are

meaningless if such a result were to occur.").  Therefore, without concluding that a special

relationship exists as a matter of law between Plaintiffs and All Seasons, at the very least, issues

of fact exist as to the scope of that relationship that must be resolved in Plaintiffs' favor in this

summary judgment setting.  Therefore, the Court recommends that All Seasons' Motion for

Partial Summary Judgment (Investment Losses) (Docket No. 338) be denied in this respect .  At

this time, then, the economic loss rule will not bar any remaining tort claims asserted against All

Seasons.[23]

> E.     Plaintiffs' Motion for Partial Summary Judgment (Fraud) (Docket No. 332)[24]
>
>> 1.     Scope of Plaintiffs' Motion for Partial Summary Judgment (Fraud)

As the Court reads Teton Springs' First Amendment to Answer (Docket No. 151), Teton

Springs asserts two, separate fraud claims against Plaintiffs.  First, Teton Springs alleges that

---

[23]  The same cannot be said as to any existing tort claims against Teton Springs, though. According to Plaintiffs, "only the 'unique circumstances' exception to the economic loss rule applies to the Teton Springs Defendants."  *See* Opp. to Teton Springs' Mot. for Partial Summ. J. (Investment Losses), pp. 2 & 3 (Docket No. 362).  However, the Court finds no support for the proposition that a seller/buyer relationship in a real estate transaction amounts to a unique circumstance, justifying a reallocation of the risk.  *See infra* at p. 28.  Moreover, Plaintiffs' argument in favor of the "unique circumstances" exception is premised generically upon the Act. *See id*. at p. 3; *see also* Opp. to All Seasons' Mot. for Partial Summ. J. (Investment Losses), pp. 15-16 (Docket No. 364) ("The disclosure requirements and duties imposed by the [Act] were intended to prevent exactly the type of harm suffered by Plaintiffs . . . .").  Without more, it cannot be said that Plaintiffs' real property purchases here are different from real property purchases elsewhere so as to prevent the economic loss rule from applying.  Therefore, the Court recommends that Teton Springs' Motion for Partial Summary Judgment (Investment Losses) (Docket No. 344) be granted in this respect.  At this time, then, the economic loss rule will bar any remaining tort claims asserted against Teton Springs.

[24]  Within its briefing, Plaintiffs reference Teton Springs' First Amendment to Answer (Docket No. 151) and, specifically, paragraphs 44-56 as the target of its Motion for Partial Summary Judgment (Fraud) (Docket No. 332).  *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Fraud), p. 2, n. 2 (Docket No. 333).  In its opposition, Teton Springs does not refer to another pleading.  Therefore, the Court will consider Teton Springs' First Amendment to Answer (Docket No. 151) as generating the allegations that are now the subject of Plaintiffs' Motion for Partial Summary Judgment (Fraud) (Docket No. 333).

**REPORT AND RECOMMENDATION - 30**

Plaintiffs committed fraud via its "purchase contracts".  *See id*. at ¶¶ 17-43.[25]  Second, Teton

Springs alleges that Plaintiffs committed fraud during the "lending process".  *See id*. at ¶¶ 44-

56.[26]  Plaintiffs move for partial summary judgment on the second fraud claim: "counterclaims

for fraud based on Plaintiffs' loan applications".  *See* Mem. in Supp. of Pls.' Mot. for Partial

Summ. J. (Fraud), p. 2 (Docket No. 333).  Therefore, the Court's consideration of Plaintiffs'

Motion for Partial Summary Judgment (Fraud) (Docket No. 332) extends only to the second of

Teton Springs' fraud claims.

> 2.    *Plaintiffs' Alleged Fraud During the "Lending Process" - Loan*
>        *Application Misrepresentations*

The parties do not dispute the elements of a fraud claim in Idaho; they are: (1) a

representation; (2) the falsity of that representation; (3) the materiality of the representation; (4)

the speaker's knowledge of the representation's falsity or ignorance of its truth; (5) the speaker's

intent that the representation should be acted upon by the person and in the manner reasonably

contemplated; (6) the hearer's ignorance of the representation's falsity; (7) the hearer's reliance

---

[25]  For example, Teton Springs alleges that Plaintiffs made the following
misrepresentations relative to their purchase contracts: (1) "that he/she received no offer of gifts,
trips, dinners, or other such promotional techniques to induce him/her to visit the Community or
to execute this Contract, either by direct mail or telephone" (*see* Teton Springs' First Am. to
Ans., ¶ 19 (Docket No. 151)); (2) "that he/she read, understood and had the opportunity to
consult with legal counsel and were not relying upon any representations, if any, of the Broker or
Broker's associated salespersons related to the condition of the Property or the investment
potential or resale value of the Property" (*see id*. at ¶ 27); and (3) "that he/she knew Teton
Springs and Teton Springs Realty, LLC did not sell investments in any form and did not
represent that any property will generate income or appreciation" (*see id*. at ¶ 35).

[26]  For example, Teton Springs alleges that Plaintiffs "[mis]represented to Counter-
Plaintiffs that they had the financial ability to purchase the Lots and pay for construction of the
Houses and to perform the Purchase Agreements and Construction Contracts."  *See* Teton
Springs' First Am. To Answer, ¶ 46 (Docket No. 151).

**REPORT AND RECOMMENDATION - 31**

upon the truth of the representation; (8) the hearer's right to rely upon the representation; and (9)

the hearer's consequent and proximate injury or damages caused by their reliance on the

representation.  *See* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. (Fraud), p. 3 (Docket No.

333); *see also* Opp. to Pls.' Mot. for Partial Summ. J. (Fraud), pp. 7, 10, & 12 (Docket No. 350).

Here, Plaintiffs argue that Teton Springs is incapable of proving that (1) Teton Springs relied

upon Plaintiffs' alleged misrepresentations during the loan application process when any such

representations as to income were made to a lending institution, not Teton Springs; and (2) that

Teton Springs suffered no injury as a result of Plaintiffs' alleged misrepresentation.  The Court

agrees.

       The fact that Plaintiffs made their alleged misrepresentations to lending institutions and

not to Teton Springs is not, by itself, fatal to the fraud claims at issue here.  "Liability for

misrepresentation may be based on [defendant's] statements to others that were intended by

[defendant] to reach the . . . plaintiffs."  *See Adams v. U.S.*, 622 F. Supp. 2d 996, 1004 (D. Idaho

2009) (citing *Advance-Rumely Thresher Co. v. Jacobs*, 4 P.2d 657, 660 (Idaho 1931) ("recovery

can be had for representations made to another with the intent or knowledge that they should or

would be repeated to complainant")); *Restatement (Second) of Torts* § 533 (liability for

misrepresentation arises if "the maker intends or has reason to expect that its terms will be

repeated or its substance communicated to the other and that it will influence his conduct in the

transaction . . . involved").  Still, there is no evidence in the record that (1) Plaintiffs made any

statement regarding income to the lending institutions *with the intent* that the statements be

**REPORT AND RECOMMENDATION - 32**

relayed to Teton Springs (it does not appear even to be alleged within the counterclaim itself);[27] (2) these lending institutions actually relayed these statements to Teton Springs; or (3) Teton Springs relied on particular statements of income, separate and distinct from Plaintiffs securing loans themselves.

Absent this evidence, Teton Springs cannot prove its fraud claim based upon the "lending process" - saying nothing of Plaintiffs' arguments regarding Teton Springs' alleged damages.[28] Therefore, it is hereby recommended that Plaintiffs' Motion for Partial Summary Judgment (Fraud) (Docket No. 332) be granted.[29]

## RECOMMENDATION

Based upon the foregoing, it is HEREBY RECOMMENDED that:

1.    Plaintiffs' Motion for Leave to File Third Amended Complaint (Docket No. 302) be DENIED.

2.    Plaintiffs' Motion for Partial Summary Judgment (Agency) (Docket No. 307) be resolved as follows:

---

[27]  Teton Springs alleges only that "Plaintiffs, with the knowledge and involvement of the NuWay Defendants, Eagle River Defendants and River Edge Defendants, made the representation with the intent to have Counter-Plaintiffs rely upon the false representations." *See* Teton Springs' First Am. to Ans., ¶ 51 (Docket No. 151).

[28]  The Court cannot accept Teton Springs' broader argument that Plaintiffs' ultimate inability to repay their loans amounted to a fraud perpetrated upon it because the lot sales contracts were made conditional upon Plaintiffs' ability to obtain such a loan, particularly when (1) Plaintiffs did obtain financing, and (2) the loan proceeds were then turned over to Teton Springs.

[29]  In making this recommendation, the Court is not holding that Defendants are forever precluded from offering evidence of Plaintiffs' representations to loan officers as part of its strategic defense to Plaintiffs' claims.

**REPORT AND RECOMMENDATION - 33**

> a.   NuWay was Teton Springs' agent when it came to marketing lots to Plaintiffs.  In this respect, Plaintiffs' Motion for Partial Summary Judgment (Agency) (Docket No. 307) should be GRANTED; and
>
> b.   A question of fact exists as to whether Teton Springs, as a principal, bears ultimate responsibility for conduct it contends exceed the scope of its relationship with NuWay.  In this respect, Plaintiffs' Motion for Partial Summary Judgment (Agency) (Docket No. 307) should be DENIED.

3.   Plaintiffs' Motion for Partial Summary Judgment (Affirmative Defenses) (Docket No. 325) be DENIED.

4.   All Seasons' Motion for Partial Summary Judgment (Investment Losses) (Docket No. 338) be DENIED.

5.   Teton Springs' Motion for Partial Summary Judgment and Joinder (Docket No. 344) be GRANTED only with respect to the application of the economic loss rule; in all other respects, Teton Springs' Motion for Partial Summary Judgment and Joinder (Docket No. 344) should be DENIED.

6.   Plaintiffs' Motion for Partial Summary Judgment (Fraud) (Docket No. 332) should be GRANTED.

DATED:  **August 13, 2010**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**REPORT AND RECOMMENDATION - 34**