# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| SCOTT READ, et al., | Case No.: CV 08-CV-00099 |
| Plaintiffs, | **REPORT AND RECOMMENDATION RE:** |
| vs. | |
| TETON SPRINGS GOLF & CASTING CLUB, LLC, et al., | **TETON SPRINGS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 383)** |
| Defendants. | **ALL SEASONS' MOTION FOR SUMMARY JUDGMENT (Docket No. 394)** |
| CHRIS HAMABE, et al. | **TETON SPRINGS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 409)** |
| Plaintiffs, | |
| vs. | |
| TETON SPRINGS GOLF & CASTING CLUB, LLC, et al., | |
| Defendants. | |

Currently pending before the Court are three motions: (1) Teton Springs' Motion for Partial Summary Judgment (Docket No. 383); (2) All Seasons' Motion for Summary Judgment (Docket No. 394); and (3) Teton Springs' Motion for Partial Summary Judgment (Docket No. 409). Having carefully reviewed the record, heard oral argument, and otherwise being fully advised, the Court enters the following Report and Recommendation:

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 1**

## GENERAL BACKGROUND

This case has many moving parts; however, since the beginning, the general backdrop of Plaintiffs' claims relates to the development, marketing, purchase, sale, and construction of 28 lots and homes in the Mountain Meadows Subdivision ("Subdivision") of the Teton Springs Development in Victor, Idaho. Specifically, Plaintiffs allege that Defendant Anthony Vest sold the at-issue lots to Plaintiffs through the Subdivision's developer, Defendant Teton Springs Golf & Casting Club, LLC ("Teton Springs"); built the subject homes on these lots through Defendant Headwaters Construction Company ("Headwaters")[1]; and took a commission on the transactions through Defendant All Seasons Resort Realty, LLC ("All Seasons").

Plaintiffs further allege that Teton Springs hired NuWay Partners ("NuWay") as its "co-broker" and "marketing agent" to market the Subdivision properties to Plaintiffs. According to Plaintiffs, NuWay proposed an investment plan whereby, through a series of transactions, Plaintiffs could realize instant equity/profit of upwards of $400,000, with only $2,500 down. Plaintiffs claim this was possible only through appraisal reports that had not yet been performed, recognizing that the to-be-built homes were worth far less than the amounts NuWay promised during its "marketing pitch."

As purchasers of these 28 lots and homes, Plaintiffs take issue with the alleged manner in which Defendants marketed and sold those properties. Defendants, in turn, deny Plaintiffs' claims, contending further, that Plaintiffs themselves were integral and knowledgeable players in an investment plan that ultimately backfired.

---

[1] On February 2, 2011, Plaintiffs' counsel and Defendant Headwaters' counsel submitted a Stipulation to Dismiss Claims [against Headwaters] (Docket No. 519).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 2**

<u>**REPORT**</u>

**I.      Motions for Summary Judgment: Standard of Review**

Summary judgment is used "to isolate and dispose of factually unsupported claims . . . ."

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural

shortcut," but is instead the principal tool[ ] by which factually insufficient claims or defenses

[can] be isolated and prevented from going to trial with the attendant unwarranted consumption

of public and private resources."  *See id*. at 327.  "[T]he mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."  *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

However, the evidence, including all reasonable inferences which may be drawn

therefrom, must be viewed in a light most favorable to the non-moving party (*see id*. at 255) and

the Court must not make credibility findings.  *See id*.  Direct testimony of the non-movant must

be believed, however implausible.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir.

1999).  On the other hand, the Court is not required to adopt unreasonable inferences from

circumstantial evidence.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine

issue of material fact.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To carry

this burden, the moving party need not introduce any affirmative evidence (such as affidavits or

deposition excerpts) but may simply point out the absence of evidence to support the nonmoving

party's case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *See Anderson*, 477 U.S. at 256-57. The non-moving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *See Celotex*, 477 U.S. at 324. However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *See Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). A statement in a brief, unsupported by the record, cannot be used to create an issue of fact. *See Barnes v. Independent Auto. Dealers*, 64 F.3d 1389 n. 3 (9th Cir. 1995).

Here, there are three pending motions for summary judgment. The standard of review identified above will be applied to each motion.

## II.    Teton Springs' Motion for Partial Summary Judgment (Docket No. 383)

The first three causes of action within Plaintiffs' Second Amended Complaint speak to Teton Springs' alleged violations of the Interstate Land Sales Full Disclosure Act ("ILSFDA"). *See* Pls.' Second Am. Compl., ¶¶ 6.1-6.40 (Docket No. 219). Though not disputing ILSFDA's application, generally, to projects like the Subdivision, through its Motion for Partial Summary Judgment, Teton Springs argues that ILSFDA's recording, registering, and/or reporting requirements under 15 U.S.C. §§ 1703(a)(1)(A & B) (the first two causes of action) do not apply here because (1) the Subdivision is exempt from the ILSFDA under the Single Family Residence

Exemption ("SFRE"); and (2) two of the Subdivision homes purchased were model homes and, thus, are exempt from the ILSFDA under the Improved Lot/Two-Year Completion Exemption ("Improved Lot Exemption").  *See* Teton Springs' Mem. in Supp. of Mot. for Summ. J., p. 3 (Docket No. 391).  Teton Springs additionally argues that ILSFDA's anti-fraud provisions under 15 U.S.C. § 1703(a)(2)(A-C) (the third cause of action) are inapplicable because Plaintiffs' lot sale contracts encapsulate the universe of representations made, thus precluding Plaintiffs from relying on any representations outside of the lot sale contracts themselves.

A.    The SFRE

The parties agree that the ILSFDA is a consumer protection statute, designed to ensure full disclosure to consumers of relevant facts before purchasing certain kinds of real estate.  *See* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., pp. 9-10 (Docket No. 391); *see also* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 4 (Docket No. 428).  The ILSFDA provides eight categories of exemptions from its registration and disclosure requirements, including the SFRE.

For a subdivision to qualify for the SFRE, its developer must comply with seven requirements: (1) the subdivision meets all local codes/standards and is either zoned for or limited exclusively to single family residences; (2) the lot is situated on a paved street or highway which has been built to standards applicable to those maintained by local government; (3) at the time of closing, potable water, sanitary sewage disposal, and electricity have been (or will be) extended to the lot; (4) the contract of sale requires delivery of a warranty deed to the purchaser; (5) at the time of closing, a title insurance binder or title opinion reflecting the condition of the title shall be in existence and issued/presented to the buyer; (6) the buyer has

made a personal, on-the-lot inspection of the lot purchased, prior to signing the contract/agreement to purchase; and (7) there are no offers, by direct mail or telephone solicitation, of gifts, trips, dinners, or other such promotional techniques to induce prospective purchasers to visit the subdivision or to purchase a lot. *See* 15 U.S.C. § 1702(b)(5).

Teton Springs argues that each of these seven requirements are met, thus exempting the Subdivision from the ILSFDA under the SFRE. *See* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., pp. 12-15 (Docket No. 391). Plaintiffs disagree, arguing that two of the seven requirements are not satisfied, stating:

> [O]nly one Plaintiff visited his lot prior to entering into the Lot Sales Contracts. Also, immediately prior to Plaintiffs' purchases, NuWay was sending emails to Plaintiffs and others and presenting the Mountain Meadows investment at lavish dinners at the Four Seasons hotels in San Francisco and Palo Alto.

*See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., pp. 6-7 (Docket No. 428).[2] The Court agrees with Teton Springs, finding that the SFRE applies to the Subdivision.

### 1. The Lot Sale Contracts' Covenants

Each Plaintiff entered into a "Teton Springs Contract for Lot Sale," outlining the "terms, conditions, and obligations" corresponding to lot sales. *See* Exs. 1-28 in Supp. of Teton Springs' Mot. for Partial Summ. J. (Docket Nos. 391, Att. 2-113). Within these lot sale contracts, each Plaintiff acknowledged the following covenants:

> **Purchaser's Covenants:** The Purchaser covenants and acknowledges that: (a) Purchaser has received copies of the Declaration and agrees to be bound by the terms and conditions of such document; (b) Purchaser or his or her spouse has made a personal, on-the-lot inspection of the above-described Lot prior to the signing of this Contract; (c) Purchaser has received no offer of gifts, trips, dinners,

---

[2] The undersigned previously found that "NuWay, acting as a 'middleman' for these transactions, was at the very least, Teton Springs' agent when it came to marketing these lots to Plaintiffs." *See* 8/13/10 Rpt. and Recomm., p. 17 (Docket No. 477). U.S. District Judge Edward J. Lodge adopted this finding. *See* 9/28/10 Order (Docket No. 493).

or other such promotional techniques to induce him/her to visit the Teton Springs Community or to execute this Contract, either by direct mail or telephone; (d) Seller acknowledges receipt of a good-faith written estimate of the cost of maintaining the roads over the first ten (10) years of ownership, which estimate is attached as Exhibit "A" hereto and incorporated herein by this reference; and (e) Purchaser has received a good-faith estimate of the year in which the roads, water and sewer facilities and promised amenities will be completed, a copy of which is attached hereto as Exhibit "B" and incorporated herein by this reference.

*See, e.g.*, *id*. at Ex. 1A at p. 7, ¶ 14 (Docket No. 391, Att. 2).[3] Relevant to whether the SFRE applies here, it is clear that, when entering into the lot sale contracts, each Plaintiff agreed that (1) an on-the-lot inspection of the purchased lot took place prior to signing the lot sale contract, and (2) no offers of gifts, trips, dinners, or other promotions were made to induce the purchased lot. *See id*.

Plaintiffs dismiss the import of the covenants they contractually agreed to, arguing that (1) they were fraudulently induced to enter into the lot sale contracts in the first place and, therefore, should be permitted to rely upon extra-contractual representations; and (2) "Teton Springs cannot hide behind the fraudulent terms of the [lot sale] contract[s]" when Teton Springs itself drafted the lot sale contracts for the very purpose of satisfying the SFRE. *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., pp. 8-17 (Docket No. 428). These arguments are not persuasive.

First, the Court does not dispute that it is possible to be fraudulently induced to enter into a contract; however, the Court fails to see how Teton Springs unilaterally hoodwinked Plaintiffs into saying something that was not true. *Contra id*. at p. 11 ("Clearly . . ., Vest and his attorneys

---

[3] Each Plaintiff not only signed their respective lot sale contract, they also affixed their initials at the bottom of each page of the contract, including page seven, containing paragraph 14's "Purchaser's Covenants." *See, e.g.*, Ex. 1A in Supp. of Teton Springs' Mot. for Partial Summ. J., pp. 7 & 10 (Docket No. 391, Att. 2).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 7**

drafted this 'covenant' that each purchaser made an on-lot inspection into the Lot Sales Contract

to avoid the requirements of the Act.  But, it doesn't mean it actually happened.").  It would be

one thing if it was Teton Springs who, acting on its own, stated that on-site inspections took

place and that no promotional inducements were offered; but it was *Plaintiffs* who made such

statements.  If, in fact, such situations never occurred, why did Plaintiffs state otherwise, unless

they, too, were willing participants in plan designed to take advantage of a ripe real estate

opportunity at any cost.  As stated before, "it is inescapable to the sideline observer that this

litigation has the flavor of an unfortunate by-product of various individuals and entities trying to

take advantage of an overly optimistic real estate market and, if all went according to everyone's

rosy anticipation for the future, whether this action would even exist."  *See* 8/13/10 Rpt. and

Recomm., p. 9 (Docket No. 477); *see also Stein v. Paradigm Mirasol, LLC*, 586 F.3d 849, 852

(11th Cir. 2009) ("In a market-based economy the price of housing, like other goods, is subject

to swings.  There was a sharp upward swing in housing prices between late 2000 and the end of

2005, and the resulting bubble was bigger in Florida than it was in most other states . . . .  All

bubbles eventually burst, as this one did.  The bigger the bubble, the bigger the pop.  The bigger

the pop, the bigger the losses.").  Even if the representations made within the lot sale contracts

were not true, at the very least, Plaintiffs themselves knowingly made these statements.[4]  Under

---

[4] Plaintiffs anticipated this argument in their briefing.  *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 11 (Docket No. 428) ("Plaintiffs anticipate that the Teton Springs Defendants will argue that the 'purchaser's covenants' actually supports its position that Plaintiffs, and not themselves, made material misrepresentations.  This misconstrues the truth.").  Except Plaintiffs fail to explain how their own acknowledgment of the covenants "misconstrues the truth," focusing instead on comparing the covenant's language to the SFRE's language and on NuWay's alleged marketing techniques.  *See id.* at pp. 11-12.  These factors do not explain why Plaintiffs said that certain things happened/did not happen, if, in fact, they did/did not happen, as the case may be.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 8**

these circumstances, the Court will not rescue Plaintiffs from their own, deliberate representations at Teton Springs' expense. *Cf. Irwin Rogers Ins. Agency, Inc. v. Murphy*, 833 P.2d 128, 131 (Idaho Ct. App. 1992) ("The rule in Idaho is well established that a party's failure to read a contract will not excuse his performance.").

Second, the similarity between the lot sale contracts' covenant language vis à vis the SFRE's statutory terminology does not cause the Court any heartburn here. Indeed, it is often prudent when drafting contractual provisions to reflect compliance with a particular law, for the contract language to track the language of the law itself. The Court is not persuaded by Plaintiffs' argument that the lot sale contracts reflect "clever drafting" or that, via the covenants contained within the lot sale contracts, Teton Springs sought to improperly sidestep ILSFDA's requirements. *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 15 (Docket No. 428). Teton Springs neither made nor somehow overstated the representations needed for the SFRE to apply here and Plaintiffs' argument to the contrary, which draws upon largely inapposite authority, falls short.[5]

### 2. The HUD Exemption Order

Pursuant to 24 C.F.R. § 1710.16, Housing and Urban Development ("HUD") may exempt from ILSFDA's registration requirements any subdivision "if it is determined that

---

[5] Plaintiffs' reliance on *Gentry v. Harborage Cottages-Stuart, LLLP*, 602 F. Supp. 2d 1239 (S.D. Fla. 2009) is misplaced. In *Gentry*, the defendant attempted to segregate 36 purchase agreements (obligating the seller to complete construction within two years) from 126 total purchase agreements so that the other 90 purchase agreements satisfied the One Hundred Lot exemption of the ILSFDA. *See id*. at 1249. Such blatant manipulation of ILSFDA's reporting and disclosure requirements does not exist here, particularly when keeping in mind that, in *Gentry*, the exemption sought was the product of the vendor's sole conduct; here, the exemption reflects statements made by parties other than Teton Springs.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 9**

registration is not necessary in the public interest and for the protection of purchasers on the basis of the small amount or limited character of the offering" and certain eligibility requirements[6] are met.  *See* 24 C.F.R. § 1710.16(a).  In 2002, Teton Springs sought an exemption order from HUD "to confirm its self-determination under [the] SFRE for 196 lots within phase one of the Development."  *See* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., p. 15 (Docket No. 391).  Effective July 22, 2002, HUD issued Teton Springs an exemption order under the SFRE, stating:

> **WHEREAS** enforcement of the registration provisions of 24 C.F.R. 1700 et seq. with respect to the captioned lots is not necessary in the public interest and for the protection of purchasers on the basis of the small amount or the limited character of the offering;
>
> **NOW, THEREFORE IT IS ORDERED** that the captioned lots are exempt from the registration requirements of 24 CFR § 1700 et seq.

*See* Ex. 30 in Supp. of Teton Springs' Mot. for Partial Summ. J., pp. 7 & 10 (Docket No. 391, Att. 115) (emphasis in original).[7]  HUD's 2002 Exemption Order was based upon information

---

[6]  A regulatory exemption involves four "eligibility requirements," including: (1) the subdivision substantially meets the requirements of one of the exemptions available under the ILSFDA; (2) each contract (a) specifies the developer's and purchaser's responsibilities for providing and maintaining roads, water, sewer facilities, and any existing or promised amenities; (b) contains a good faith estimate of the year in which the roads, water, sewer facilities, and any promised amenities will be completed; (c) contains a non-waivable provision giving the purchaser the opportunity to revoke the contract until at least midnight of the seventh calendar day following the date the purchaser signed the contract; and (d) contains a provision that obligates the developer to deliver to the purchaser within 180 days of the date the purchaser signed the sales contract, a warranty deed free from any monetary liens or encumbrances; (3) the purchaser or the purchaser's spouse makes a personal on-the-lot inspection of the lot to be purchased before signing the contract; and (4) the developer files a request for an exemption order and supporting documentation.  *See* 24 C.F.R. § 1710.16(b)(1-4).

[7]  The Court notes that, at the time of Teton Springs' application to HUD in 2002, it sought an exemption as to "196 lots within phase one of the Development."  *See supra* at p. 10. It is not immediately clear from the record whether these identified lots encompass the lots purchased by Plaintiffs here.  *But see infra* at pp. 11-13.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 10**

provided to HUD by Teton Springs.  *See id.* ("**THIS ORDER** is limited to the facts, affirmations and representation as to the method of operation set forth in the request and upon which issuance of this ORDER is based.") (emphasis in original).

Over the next several years, this dispute arose and, after initiating this action, Plaintiffs' then-counsel lodged an objection with HUD, challenging Teton Springs' exemption from the ILSFDA under the SFRE.  On April 8, 2009, HUD issued the following decision:

> The purpose of this letter is to inform you that the Department has closed its investigation into Teton Springs Golf & Casting Club, LLC d/b/a Teton Springs' ("Developer") alleged violation of the Interstate Land Sales Full disclosure Act ("Act"), 15 U.S.C. § 1701 *et seq*.
>
> Specifically, your clients have alleged that the Developer's sales offering in the Teton Springs Golf & Casting Club is not exempt under the Single-Family Residence Exemption pursuant to 24 CFR 1710.10.  Your clients alleged that the Developer failed to meet the requirement that there would be no offers, by direct mail or telephone solicitation, or gifts, trips, dinners or use of similar promotional techniques to induce prospective purchasers to visit the subdivision or to purchase a lot during the promotion of the subdivision pursuant to 24 CFR 1710.10(b)(2). Your clients further alleged that the Developer failed to comply with the anti-fraud provisions of the Act pursuant to 24 CFR 1710.10(d).  Your clients also alleged that the Developer failed to have in existence and issued at the time of closing, a title insurance binder or title opinion reflecting the condition of title pursuant to 24 CFR 1710.10(c)(7) and failed to have the purchaser or purchaser's spouse make a personal, on-the-lot inspection of the lot purchased prior to signing a contract or agreement to purchase pursuant to 24 CFR 1710.10(c)(8).
>
> After a review of the information you and the Developer submitted, the Department has determined that no further action by this office would be warranted.  The Department's conclusions are based on the fact that the Developer's offering met the aforementioned requirements of the Single-Family Residence Exemption.  In their contract, the purchasers agreed that there were no offers, by direct mail or telephone solicitation, of gifts, trips, dinners or use of similar promotional techniques to induce prospective purchasers to visit the subdivision or to purchase a lot during the promotion of the subdivision by the Developer; purchasers agreed in their contract that the purchaser or purchaser's spouse made a personal, on-the-lot inspection of the lot purchased prior to signing a contract or agreement to purchase; at the time of closing, a title insurance binder or title opinion reflecting the condition of title was in existence and there is no

evidence presented that the Developer was not in compliance with the anti-fraud provisions as outlined under 24 CFR 1710.4(b) and (c).

Under the circumstances the Department can only suggest that your clients continue to seek legal advice. Thank you for your patience in this matter.

*See id*. at Ex. 32 (Docket No. 391, Att. 117).

Also on April 8, 2009, HUD sent a similar letter to Teton Springs' counsel. *See id*. at Ex. 31 (Docket No. 391, Att. 116). While outlining the same reasons for dismissing Teton Springs' alleged ILSFDA violations, HUD further noted that, "should HUD become aware of more information regarding this matter in the future, the Department reserves the right to reopen its investigation." *See id*. The record contains no further correspondence from HUD.

Teton Springs appropriately finds support in HUD's 2002 and 2009 determinations. *See* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., p. 16 (Docket No. 391) ("The affirmations in HUD's investigative findings, further demonstrate that the Subdivision is exempt from registration under the Act."). In response, Plaintiffs question the applicability of HUD's 2002 Exemption Order on ILSFDA's anti-fraud provisions while, again, stating matter-of-factly that "the pre-requisites to the SFRE were not met, four years after the [2002] advisory opinion was issued." *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 17 (Docket No. 428).

Plaintiffs' arguments in these respects miss the point. First, Teton Springs uses the HUD decisions as evidence of the Subdivision's exemption under the SFRE; it never attempts to likewise dismiss ILSFDA's anti-fraud provisions using those decisions. *See* Teton Springs' Reply in Supp. of Mot. for Summ. J., p. 2, n. 1 (Docket No. 440) ("The Teton Springs Defendants have never argued that the HUD Exemption Order impacts the Act's anti-fraud provision, only that it is instructive as to application of the SFRE."). Second, and most

importantly, while stating that the SFRE does not apply, Plaintiffs' briefing ignores HUD's 2009 correspondence, confirming its decision from 2002 - but, now, *after* an investigation incorporating substantive input from Plaintiffs themselves. *See supra* at p. 10, n. 7.

Though not binding, the Court finds persuasive the 2002 and 2009 HUD decisions, recognizing the deference that must be lent to such administrative agencies when interpreting a statute's application to a set of circumstances. *See Markowitz v. Northeast Land Co.*, 906 F.2d 100, 105 (3rd Cir. 1990) ("When Congress vests an agency such as the Department of Housing and Urban Development with the power to administer a statute, the Supreme Court requires us to defer to the agency's reasonable construction of the statute.") (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-45 (1984)). These HUD decisions provide additional support for the Subdivision qualifying under the SFRE to the ILSFDA.

Together, (1) Plaintiffs' own representations on their lot sale contracts and (2) the corresponding HUD decisions combine to demonstrate that the Subdivision meets the SFRE and is therefore exempt from ILSFDA. The Court is satisfied that, based upon the record, reasonable minds cannot differ on this discrete point. Therefore, it is hereby recommended that Teton Springs' Motion for Partial Summary Judgment (Docket No. 383) be granted in this respect.

B.    The Improved Lot Exemption

Another exemption under ILSFDA is the Improved Lot Exemption, applying "to the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building . . . ." *See* 15 U.S.C. § 1702(a)(2). Teton Springs argues that Plaintiffs Ed and Flora Supelveda and Bulmaro Gonzalez purchased completed model homes, and thus, those purchases are fully exempt from any provisions under the ILSFDA. *See* Teton Springs' Mem. in

Supp. of Mot. for Partial Summ. J., p. 17 (Docket No. 391). Plaintiffs "concede that Plaintiffs Bulmaro Gonzalez and Ed Supelveda purchased completed model homes which fall under the 'Improved Lot Exemption.'" *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 2, n. 4 (Docket No. 428).[8] Therefore, it is hereby recommended that Teton Springs' Motion for Partial Summary Judgment (Docket No. 383) be granted in this respect.

C.    <u>ILSFDA's Anti-Fraud Provisions</u>

ILSFDA's anti-fraud provisions apply regardless of any SFRE or Improved Lot Exemption. They are stand-alone requirements prohibiting, among other things, "obtain[ing] money or property" by a subdivision's developer "by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statement made . . . not misleading . . . ." *See* 15 U.S.C. § 1703(a)(2)(B); *see also* 24 C.F.R. § 1710.4(b).

Although acknowledging ILSFDA's anti-fraud provisions, Teton Springs argues that Plaintiffs cannot rely on any representations made outside of Plaintiffs' lot sale contracts, based upon a provision within the lot sale contracts, which reads:

> **Sole Agreement:** This Contract supersedes any and all understandings and agreements between the parties and constitutes the sole and entire contract between the parties. No oral statements or representations whatsoever shall be considered a part hereof. Any modifications must be in writing and acknowledged by the parties hereto.

*See, e.g.*, Ex. 1A in Supp. of Teton Springs' Mot. for Partial Summ. J. at p. 8, ¶ 19 (Docket No. 391, Att. 2). Given this merger clause, Teton Springs argues that "Plaintiffs are . . . barred from making claims for fraud and misrepresentation under [ILSFDA] . . . ." *See* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., pp. 19-20 (Docket No. 391).

---

[8] The Court assumes that Flora Supelveda similarly purchased a completed model home, also falling under the Improved Lot Exemption.

Plaintiffs challenge the breadth of the merger clause, arguing that it alone cannot preclude admission of extrinsic evidence of fraud in the inducement. *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 8 (Docket No. 428) (citing *Aspiazu v. Mortimer*, 82 P.3d 830 (Idaho 2003)). In *Aspiazu*, the Supreme Court of Idaho found that, while a written contract's terms normally control, "Idaho law firmly allows that '[f]raud in the inducement is always admissible to show that representations by one party were a material part of the bargain.'" *See id.* at 833 (quoting *Thomas v. Campbell*, 690 P.2d 333, 337 (Idaho 1984)). More to the point, Chief Justice Trout commented:

> Fraud vitiates the specific terms of the agreement and can provide a basis for demonstrating that the parties agreed to something apart from or in addition to the written documents. To argue that [plaintiff] is completely bound by the written agreement disregards the purpose of demonstrating fraud. We therefore find that [plaintiff] had a right to rely on these representations made by the [defendants]

*See id.*; *see also* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 9 (Docket No. 428) (quoting *Lindberg v. Roseth*, 46 P.3d 518, 524 (Idaho 2002) (finding "the district erred in holding, as a matter of law, that the only representations upon which a fraud claim could be based were those stated in the contract.")).

The Court agrees with Plaintiffs. The point of merger clauses is to prohibit attempts to contradict the parties' agreements, not any misrepresentations leading up to those agreements. If Plaintiffs contend that Teton Springs duped them unsuspectingly into entering into the lot sale contracts, it makes little sense for Teton Springs to be absolved of its alleged conduct by pointing to the very product of the alleged fraud - the lot sale contracts with their merger clauses. Consistent with prior decisions in this case upon unrelated, but still similar issues, the Court does not read the lot sale contract's merger clause so broadly as Teton Springs suggests. *See, e.g.*, 8/13/10 Rpt. and Recomm., p. 25 (Docket No. 477) ("[E]ven when assuming that Paragraph 29

constitutes Plaintiffs' assumption of risk of investment losses generally, it cannot be said that such an assumption of risk operates to ignore subsequently-revealed breaches of duties that nonetheless may relate to investment losses . . . ."). Keeping in mind that all inferences are to be made in Plaintiffs' favor, the Court cannot decide as a matter of law that Plaintiffs are forever precluded from relying upon representations outside of the lot sale contracts.[9] Therefore, the Court recommends that Teton Springs' Motion for Partial Summary Judgment (Docket No. 383) be denied in this respect.

**III.    All Seasons' Motion for Summary Judgment (Docket No. 394)**

Through its Motion for Summary Judgment, All Seasons seeks the dismissal of all remaining claims asserted against it: (1) the ILSFDA violations (the second and third causes of action); (2) negligence (the sixth cause of action); (3) breach of contract (the seventh cause of action); and (4) joint venture (the eighth cause of action). *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., p. 2 (Docket No. 394, Att. 1). In addition to particular attacks on these individual causes of action, All Seasons also argues, generally, that Defendants' alleged omissions were not the proximate cause of Plaintiffs' injuries. *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., pp. 3-8 (Docket No. 394, Att. 1). The Court will consider each argument in the order raised within All Seasons' briefing.

A.    The ILSFDA Violations

All Seasons joins in Teton Springs' arguments concerning the alleged ILSFDA violations. *See id.* ("The arguments raised by the Teton Springs defendants are applicable to the

---

[9] This is not to say at this point that Plaintiffs have, in fact, properly alleged their related fraud claims; only that Plaintiffs are not precluded from pointing to Teton Springs' allegedly fraudulent statements. *See infra* at pp. 25-28.

claims against the All Season Resort defendants."). Therefore, the Court will apply its discussion of Plaintiffs' ILSFDA claims against Teton Springs to those claims also asserted against All Seasons. *See supra* at pp. 4-16. It is thus hereby recommended that All Seasons' Motion for Summary Judgment (Docket No. 394) be granted as to Plaintiffs' second cause of action. *See id.* at pp. 4-14. It is also recommended that All Seasons' Motion for Summary Judgment (Docket No. 394) be denied on Plaintiffs' third cause of action. *See id.* at pp. 14-16.[10]

B.    Proximate Cause

All Seasons argues that Plaintiffs' alleged injuries were not the proximate cause of Defendants' alleged wrongdoing; instead, All Seasons argues that Plaintiffs' own conduct proximately caused their injuries. *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., pp. 3 &7 (Docket No. 394, Att. 1) ("None of the plaintiffs possessed the individual resources to purchase their property. For that reason, if the plaintiffs had not been able to obtain financing, they would not have purchased in Teton Springs and would not have experienced any of the damages they seek in this litigation. . . . . Regardless of any actions of the All Season Resort defendants, if the Plaintiffs had provided truthful and accurate information in their loan applications, they would not have been approved for financing and they would not have been able to purchase property to Teton Springs.").

_____

[10] During oral argument, All Seasons' counsel stated that, of all Plaintiffs, only Paul Maples and Gentry Gardner had any contact with All Seasons' Sarah Anderson and that such contact took the form of face-to-face meetings. According to All Seasons, these face-to-face meetings - even if fraudulent - could not violate ILSFDA's anti-fraud provisions because they did not involve interstate commerce. However, All Seasons' briefing on Plaintiffs' ILSFDA claims does not present such a focused argument. *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., pp. 2-3 (Docket No. 394, Att. 1); *see also* All Seasons' Reply in Supp. of Mot. for Summ. J., p. 13 (Docket No. 459). There was no response from Plaintiffs during oral argument on this discrete issue. While the facts needed to support such an argument may very well be present somewhere in the cumbersome record of this case, the Court cannot grant summary judgment as to this alternate argument based upon the actual briefing presented to the Court thus far.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 17**

"The question of proximate cause is one of fact and almost always for the jury." *See Cramer v. Slater*, 204 P.3d 508, 515 (Idaho 2009). Here, the question of proximate cause is just such a fact question, to be resolved by the jury, particularly when recognizing that injuries may be the result of multiple proximate causes, regardless of the extent to which each contributes to those injuries. Certainly, there a number of possible proximate causes here - how the Subdivision was marketed; the representations made leading up to Plaintiffs' purchases into the Subdivision; the manner in which Eagle River Mortgage, Inc. ("Eagle River") instructed Plaintiffs to fill out their loan applications; the way Plaintiffs actually "filled" out their loan applications; or, of course, something else. Untangling these causes and their respective, foreseeable (if at all), contributions to Plaintiffs' alleged injuries (including identifying which conduct played a "substantial factor" in causing the injuries) is necessarily a fact-intensive inquiry, incapable of resolution as a matter of law, on summary judgment. At the very least, reasonable minds could differ on the issue of causation in this case, including whether All Seasons played any role in Plaintiffs' claimed injuries.[11]

Therefore, it is hereby recommended that All Seasons' Motion for Summary Judgment (Docket No. 394) be denied to the extent that future resolution of a remaining cause of action

---

[11] All Seasons also argues that, had Plaintiffs provided accurate information concerning their incomes and intention to use the purchased properties for investment purposes, their loan applications would have been denied outright. *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., p. 6 (Docket No. 394, Att. 1). However, the balance of supporting affidavits suggest only that Plaintiffs' loan applications would have been denied if lenders were aware that the applicant intentionally provided significantly false financial information. *See, e.g.*, 3/12/10 PNC Bank Aff. at ¶ 7 (Docket No. 395); *see also* 3/31/10 Mullins Aff. at ¶ 2 (Docket No. 434); *but see* 3/15/10 Moody Aff. at ¶ 6 (Docket No. 397). In other words, it is not altogether clear whether Plaintiffs would have even been denied loans had they originally provided accurate information (income and intended use of the property) on their loan applications. Even so, the Court's listened carefully to All Seasons' counsel's account of the very limited actual financial means of certain Plaintiffs when applying for the at-issue loans.

turns on the absence of any proximate cause specific to Defendants' conduct, including All Seasons.

C.    Contract Claims

All Seasons argues that Plaintiffs' breach of contract claims are also without merit because (1) there were no written agreements capable of being breached between Plaintiffs and All Seasons and (2) there is no basis to assert quasi contract claims against All Seasons. *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., pp. 8-10 (Docket No. 394, Att. 1).

Plaintiffs concede that all contractual and quasi-contractual claims against All Seasons should be dismissed, with the exception of Plaintiffs Gonzalez and Supelveda. *See* Pls.' Opp. to All Seasons' Mot. for Summ. J., p. 24 (Docket No. 453). According to Plaintiffs, "All Season and Anderson were, in fact, the designated broker and agent (respectively) for Supelveda and Gonzalez." *See id.* In support of this alleged relationship, Plaintiffs point to the Real Estate Purchase and Sale Agreements for both Mr. Gonzalez and Mr. Supelveda. *See id.* at p. 24, n. 96.

The referenced Real Estate Purchase and Sale Agreements identify All Seasons' predecessor, Teton Springs Realty, as the "listing agency." *See, e.g.*, Real Estate Purchase and Sale Agreement (Docket No. 360, Atts. 5 & 6). As All Seasons points out, however, within these Real Estate Purchase and Sale Agreements, it specifically states that "[t]he brokerage [All Seasons] working with the BUYER(S) is acting as a NONAGENT for the BUYER(S)." *See id.* at ¶ 31. Moreover, the deposition testimony from Sarah Anderson, Mr. Supelveda, and Mr. Gonzalez further supports a finding of no representation agreement between All Seasons and Messrs. Supelveda and Gonzalez. *See* All Seasons' Reply in Supp. of Mot. for Summ. J., p. 2 (Docket No. 459).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 19**

Therefore, it is hereby recommended that All Seasons' Motion for Summary Judgment (Docket No. 394) be granted in this respect.

D.     Negligence

After All Seasons moved for summary judgment on Plaintiffs' negligence claim, the Court took up All Seasons' then-pending Motion to Dismiss Plaintiffs' Sixth Cause of Action (Docket No. 210) and found that Plaintiffs' allegations of negligence against All Seasons amounted to allegations of negligent misrepresentation - a claim not recognized under Idaho law. *See* 8/13/10 Rpt. and Recomm., p. 12, n. 5 (Docket No. 477). At that time, the undersigned recommended that the claim be dismissed (*see id*.); Judge Lodge adopted the recommendation and dismissed Plaintiffs' negligence claim against All Seasons. *See* 9/28/10 Order, pp. 11-15 (Docket No. 493). Therefore, to the extent necessary, it is hereby recommended that All Seasons' Motion for Summary Judgment (Docket No. 394) be granted in this respect.

E.     Joint Venture

For their eighth cause of action, Plaintiffs claim that Defendants, including All Seasons, engaged in a joint venture to illegally market and sell the Subdivision properties. *See* Pls.' Second Am. Compl., ¶¶ 5.1, 6.61-6.62 (Docket No. 219).

In Idaho, five factors must be met in order for a joint venture to exist: (1) a contribution by the parties of money, property, effort, knowledge, skill, or other assets to a common undertaking; (2) a joint property interest in the subject matter of the venture and a right of mutual control or management of the enterprise; (3) expectation of profits, or the presence of a venture; (4) a right to participate in the profits; and (5) a limitation of the objective to a single undertaking or ad hoc enterprise. *See Rhodes v. Sunshine Mining Co.*, 742 P.2d 417, 420-21

(Idaho 1987). "Whether a relation of joint adventures exists is primarily a question of fact for the trial court to determine from the facts and the inferences to be drawn therefrom." *See id*. at 421 (quoting *Stearns v. Williams*, 240 P.2d 833, 838-39 (Idaho 1952)).

Through its Motion for Summary Judgment, All Seasons argues that it did not enter into the alleged joint venture because All Seasons "had no involvement in selecting the appraiser and were not involved in appraising the individual properties . . . ." *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., p. 14 (Docket No. 394, Att. 1). All Seasons goes on to argue that "All Seasons had [no] involvement in the loan application and approval process." *See id*. As a consequence, according to All Seasons, "[t]he lack of involvement or knowledge[12] of the details of the lending process by [All Seasons] . . . defeats a critical element of the plaintiffs' joint venture theory.").[13]

Plaintiffs disagree with All Seasons' characterization of itself as an innocent bystander to NuWay's marketing efforts, pointing out, through Plaintiff Paul Maples' deposition testimony,

---

[12] All Seasons seems to equate its alleged lack of *involvement* in the appraisal/loan application process with a complete lack of *knowledge* of those same events. *See, e.g.*, All Seasons' Mem. in Supp. of Mot. for Summ. J., pp. 15-16 (Docket No. 394, Att. 1); *see also* All Seasons' Reply in Supp. of Mot. for Summ. J., p. 10 (Docket No. 459). The Court is not convinced that the record offered thus far appropriately establishes both.

[13] All Seasons also argues that there is no evidence of the Defendants reaching an agreement to share profits, noting that All Seasons was only paid its due-and-owing commissions pursuant to a Seller's Representation Agreement. *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., p. 16 (Docket No. 394, Att. 1). "Sharing of profits and losses is an important consideration [in determining a joint venture], but not essential." *See Saint Alphonsus Reg'l Med. Ctr., Inc. v. Krueger*, 861 P.2d 71, 77 (Idaho Ct. App. 1992) (citing *Rhodes*, 742 P.2d at 421). Regardless, the Court is not convinced that All Seasons' receipt of its standard commissions exhibits a lack of any agreement to share in the rewards of a joint venture when recognizing the possibility that such commissions may not have been possible, but for the joint venture itself.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 21**

that Sarah Anderson originally marketed Mountain Meadows as containing appraisal-based

"instant equity," just as NuWay later did:

> Q: In your conversations with Sarah Anderson and your meeting with her at the Laguna Hotel, did she market the property to you as an investment?
>
> A: Yes.
>
> Q: Did she talk about instant equity?
>
> A: Yes.
>
> Q: What was the instant equity based on?
>
> A: An appraisal price versus what my purchase price would be.
>
> Q: And this is independent of NuWay?
>
> A: Yes.

*See* Pls.' Opp. to All Seasons' Mot. for Summ. J., p. 20 (Docket No. 453). Relatedly, Plaintiffs

also cite to J.T. Bramlette's deposition testimony to infer that All Seasons already employed, or

at least was aware of, the inflated appraisals needed to further Defendants' alleged venture:

> A: I knew that Rob or, you know – I think we knew that the properties were appraised at X dollar. When we came into Teton Springs they were already appraising that. When NuWay was asked to help assist in sales of Mountain Meadows, these properties were already appraising at this. It isn't like we created this appraisal.
>
> Q: How do you know if you never looked at an appraisal?
>
> A: Because Sarah [Anderson] told us the day we first met –.

*See id*. at pp. 201-21.

In the Court's mind, it is unclear whether (or to what extent, if at all) All Seasons

contributed to any alleged joint venture to improperly market and sell the Subdivision's lots.

Simply put, issues of fact interfere with resolving this question as a matter of law, based upon the inferences that both Plaintiffs and All Seasons ask this Court to make when considering their respective arguments.[14]

Therefore, it is hereby recommended that All Seasons' Motion for Summary Judgment (Docket No. 394) be denied in this respect.[15]

## IV.    Teton Springs' Motion for Partial Summary Judgment (Docket No. 409)

Teton Springs' Motion for Partial Summary Judgment seeks the dismissal of the following claims: (1) violation of the Idaho Consumer Protection Act (fourth cause of action); (2) fraud (fifth cause of action); (3) negligence (sixth cause of action); (4) breach of contract (seventh cause of action); and (5) joint venture (eighth cause of action). *See* Teton Springs' Mot. for Partial Summ. J., p. 1 (Docket No. 409, Att. 1).

### A.    Idaho Consumer Protection Act

The Idaho Consumer Protection Act requires that general contractors provide a "disclosure statement," setting forth a homeowner's or residential real property purchaser's: (1) right to require that the general contractor obtain lien waivers from any subcontractors providing services or materials to the general contractor; (2) right to receive from the general contractor

---

[14]  This conclusion is independent of any (non)application of the Idaho Brokerage Representation Act to Plaintiffs' potential agency and/or vicarious liability arguments that may exist as to All Seasons.

[15]  All Seasons' alternate argument that Plaintiffs' own fraudulent conduct creates an illegal, unenforceable joint venture is not persuasive at this point. *See* All Seasons' Mem. in Supp. of Mot. for Summ. J., pp. 17-18 (docket No. 394, Att. 1). While possibly true (and potentially fatal to Plaintiffs' joint venture claim), such an argument thrusts further issues of fact into whether a joint venture existed in the first place - namely the scope of each party's involvement in the marketing, purchasing, and selling of the properties within the Subdivision. Though it is difficult to presume Plaintiffs' complete inculpability here, these general issues cannot be resolved as a matter of law at this time.

proof that the general contractor has a general liability insurance policy and proof that the

general contractor has worker's compensation insurance for his employees; (3) ability to

purchase an extended policy of title insurance; and (4) right to require a surety bond in an

amount up to the value of the construction project. *See* I.C. § 45-525(2)(a-d). Additionally, the

Idaho Consumer Protection Act requires that general contractors provide a homeowner or

prospective residential real property purchaser a separate "disclosure statement," "listing the

business names, addresses, and telephone numbers of all subcontractors, materialmen, and rental

equipment providers having a direct contractual relationship with the general contractor and who

have supplied materials or performed work on the residential property of a value in excess of

$500." *See id*. at 45-525(2)(3)(a). Through their Second Amended Complaint, Plaintiffs allege

that "Headwaters, and the Defendants as agents of Headwaters," failed to comply with the

above-referenced disclosure requirements and, as a result, violated the Idaho Consumer

Protection Act. *See* Pls.' Second Am. Compl., ¶¶ 6.41-6.49 (Docket No. 219).

Plaintiffs' Idaho Consumer Protection Act claim is clearly directed at Headwaters. *See,*

*e.g.*, Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., pp. 23-24 (Docket No. 452)

("Headwaters' violations of the Consumer Protection Act allows for all actual damages . . . .";

"Defendants' motion virtually concedes that Defendant Headwaters failed to provide disclosures

as required by the Idaho Consumer Protect Act . . . ."; "It is undisputed that Headwaters failed to

provide Plaintiffs the necessary disclosures."). Plaintiffs' briefing makes no attempt to associate

Headwaters' alleged conduct to that of Teton Springs. Additionally, since filing their Motion for

Partial Summary Judgment, the parties have stipulated to Headwaters' dismissal. *See supra* at p.

2, n. 1. Without any evidence that Headwaters' conduct is attributable to Teton Springs and,

considering Headwaters' pending dismissal, there appears to be no basis to sustain Plaintiffs' Idaho Consumer Protection Act claim against either Headwaters or Teton Springs.

Therefore, it is hereby recommended that Teton Springs' Motion for Partial Summary Judgment (Docket No. 409) be granted in this respect.

B.    Fraud

"A claim of fraud requires the plaintiff to establish nine elements with particularity: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury. *Mannos v. Moss*, 155 P.3d 1166, 1170 (Idaho 2007). With these elements in mind, Teton Springs makes five, interrelated arguments: first, it made no representations to Plaintiffs; second, it is not responsible for NuWay's alleged statements; third, NuWay's alleged statements are not actionable as fraud in any event; fourth, it had no involvement in the appraisal process and is therefore not responsible for Craig Smith's, River's Edge Appraisal Service, LLC's ("River's Edge"), or Eagle River's actions; and fifth, Plaintiffs did not justifiably rely on any alleged misrepresentations. *See* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., pp. 8-16 (Docket No. 409, Att. 1).

It is undisputed that Teton Springs never spoke with Plaintiffs. However, as Teton Springs' counsel acknowledged during oral argument, this Court has since found that NuWay was Teton Springs' agent with respect to marketing lots to Plaintiffs. *See supra* at p. 6, n. 2. Although finding NuWay to be an agent of Teton Springs, this Court was also careful not to find, as a matter of law, that Teton Springs was completely responsible for NuWay's conduct:

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 25**

Yet, in so deciding, the Court is not ruling as a matter of law that Teton Springs, as a principal, bears ultimate responsibility for conduct it contends exceeded the scope of such a relationship. As to the full scope of NuWay's authority, a battleground of competing arguments exists (applicable to either the [Idaho Real Estate Brokerage Representation] Act or Idaho common law, as the case may be) that, based upon the record now before this Court, cannot be reconciled via summary judgment.

*See* 8/13/10 Rpt. and Recomm., pp. 17-18 (Docket No. 477) (footnote discussing Idaho Real Estate Brokerage Representation Act's effect on vicarious liability omitted). The Court's previous reluctance to impute all of NuWay's conduct upon Teton Springs when entertaining Plaintiffs' earlier Motion for Partial Summary Judgment (Docket No. 307) has not changed. That issue, including Teton Springs' knowledge of NuWay's conduct/representations to Plaintiffs, remains left to the fact-finder's consideration.

The Court is also not prepared to find that NuWay's alleged statements are incapable of supporting a fraud claim as a matter of law. According to Plaintiffs, the lynchpin of its fraud claim relates to NuWay's claims of "instant equity." *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 6 (Docket No. 452) (" . . . NuWay's fraudulent misrepresentations were based on (allegedly) existing fact, not future predictions. Plaintiffs were induced into purchasing the homes based on NuWay's numerous representations, including that the houses had 'instant equity' of $300,000-$400,000."). These alleged statements do not relate solely to the whims of future events as Teton Springs argues (*see* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., p. 9 (Docket No. 409, Att.1)), but affirmatively relay the prospect of "instant equity" to any lucky purchaser. Further, the fact that River's Edge appraisals may have "actually reflected values in the $1.3 to $1.4 million range" and, therefore, were technically not false, according to Teton Springs (*see id.* at pp. 9-10), ignores the very real possibility that the

appraisals themselves were purposely/negligently inflated such that they did not accurately reflect the properties' true worth. *See Jordan v. Hunter*, 865 P.2d 990, 998 (Idaho Ct. App. 1993) ("As our Supreme Court has recognized . . . 'where actual value is known and false statements are knowingly made with intention to deceive, and do deceive the parties to whom they are made, such statements constitute actionable fraud. Such statements are not expressions of opinion but are statements of material facts.' Whether a statement was intended as a mere expression of opinion or an affirmation of fact is a question of fact.") (quoting *Fox v. Cosgriff*, 159 P.2d 224, 227 (Idaho 1945)). Thus, whether these sorts of statements are (or are not) actionable as fraud cannot be decided via summary judgment.[16]

Finally, Teton Springs' argument that Plaintiffs could not have justifiably relied upon the alleged misrepresentations given their assumption of the risk of any investment losses, ignores the Court's previously handling of that issue. *See* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., p. 15 (Docket No. 409, Att. 1) (". . . Plaintiffs assumed the risks of market fluctuations and are now looking to hold someone else responsible for the unfortunate national drop in property values that has affected all property owners."). On this point, the Court considered Paragraph 29 of the lot sale contracts within All Seasons' and Teton Springs' Motions for Summary Judgment, finding:

---

[16] Through affidavits, Plaintiffs testified that these representations were material. *See* Pls.' Affs. (Docket No. 451, Atts. 1-18). In their briefing, Plaintiffs also identify Teton Springs' representations concerning NuWay's commissions and donations to the Teton Springs Foundation. *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 9 (Docket No. 452). While these same affidavits speak to the alleged materiality of NuWay's commissions (*see, e.g.*, Hamabe Aff. at ¶ 5.2 (Docket No. 451, Att. 7)), they do not speak to donations to the Teton Springs Foundation; moreover, such alleged misrepresentations are not included within Plaintiffs' Second Amended Complaint. Therefore, any representations concerning donations to the Teton Springs Foundation cannot supplement any surviving fraud claim.

> In reading Paragraph 29, the Court concludes that it may not be as encompassing as All Seasons understandably wants it to be. First, it is questionable whether the language within Paragraph 29 represents an assumption of risk with respect to *anything*, let alone investment losses (although that is admittedly possible). What is clear, however, is that Paragraph 29 seeks to (and does) affirm the nature of representations made between parties and, likewise, the reliance (or lack of reliance) on those representations when entering into a contract to purchase property. Second, even when assuming that Paragraph 29 constitutes Plaintiffs' assumption of risk of investment losses generally, it cannot be said that such an assumption of risk operates to ignore subsequently-revealed breaches of duties that nonetheless may relate to investment losses (again, whatever that term may mean). This represents the core of Plaintiffs' opposition to All Seasons' summary judgment arguments and, keeping in mind that all inferences are to be made in Plaintiffs' favor, the Court cannot decide as a matter of law that Plaintiffs assumed the risks of what ultimately (and allegedly) transpired when purchasing properties in the Mountain Meadows subdivision.

*See* 8/13/10 Rpt. and Recomm., pp. 25-26 (Docket No. 477). For similar reasons, as well as those relating to Teton Springs' arguments surrounding the effect of the lot sale contracts' merger clause (*see supra* at pp. 14-16), too many inferences must be made in Teton Springs' favor to assume that Plaintiffs did not rely upon the alleged misrepresentations as a matter of law. At this stage of the litigation, those inferences are to be made in Plaintiffs' favor.[17]

Therefore, it is hereby recommended that Teton Springs' Motion for Partial Summary Judgment (Docket No. 409) be denied in this respect. *But see supra* at p. 27, n. 16.

C.     <u>Negligence</u>

As the sixth cause of action within their Second Amended Complaint, Plaintiffs assert negligence claims against "all Defendants," including Teton Springs, stating generally that "[a]ll Defendants owed legal duties to Plaintiffs. All Defendants' conduct as outlined above breached

---

[17] As stated previously in the Court's Report and Recommendation, All Seasons and Teton Springs are permitted to raise their assumption of risks defenses and/or lack of reliance arguments at trial; again, the extent of their application to preemptively forbid any of Plaintiffs' claims is beyond this Court's consideration at this time.

those duties to Plaintiffs. All Defendants' breaches of their legal duties to Plaintiffs proximately caused Plaintiffs' damages." *See* Pls.' Second Am. Complaint, ¶ 6.57 (Docket No. 219). Plaintiffs go on to describe the "specific[ ]" conduct of River's Edge and All Seasons in the next two paragraphs. *See id.* at ¶¶ 6.58 & 6.59. As Teton Springs argues, Plaintiffs appear to base their stated negligence claim against Teton Springs solely upon River's Edge's conduct (*see* Teton Springs' Mem. in Supp. of Mot. for Partial Summ. J., p. 16 (Docket No. 409, Att. 1). Yet, aside from these cursory allegations, Plaintiffs' Second Amended Complaint fails to clearly make this connection - particularly when River's Edge is not even mentioned within those allegations discussing "agency/joint venture," "aiding and abetting," "conspiracy," and "acting in concert (*see* Pls.' Second Am. Compl., ¶¶ 5.1-5.4 (Docket No. 219)).

In response, Plaintiffs argue that Teton Springs owed broad duties of care, such that "the marketing of Mountain Meadows [as] its 'number one priority' to 'ensure a continuing pipeline of sales'" and its "extraordinary illegal and secret agreement with NuWay and All Seasons" somehow reflect a breach of such duties. *See* Pls.' Opp. to Pls.' Mot. for Partial Summ. J., pp. 17-18 (docket No. 452). Without deciding here whether such allegations constitute a viable negligence claim against Teton Springs, the Court notes that, in its earlier Report and Recommendation, the Court applied the economic loss rule to bar any tort claims against Teton Springs, finding:

> According to Plaintiffs, "only the 'unique circumstances' exception to the economic loss rule applies to the Teton Springs Defendants."[18] However, the Court finds no support for the proposition that a seller/buyer relationship in a real

---

[18] Although submitted before the Court's Report and Recommendation, Plaintiffs make this same argument in opposing Teton Springs' Motion for Partial Summary Judgment. *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., p. 18, n. 63 (Docket No. 452).

estate transaction amounts to a unique circumstance, justifying a reallocation of the risk. Moreover, Plaintiffs' argument in favor of the "unique circumstances" exception is premised generically upon the Act. Without more, it cannot be said that Plaintiffs' real property purchases here are different from real property purchases elsewhere so as to prevent the economic loss rule from applying. Therefore, the Court recommends that Teton Springs' Motion for Partial Summary Judgment (Investment Losses) (Docket No. 344) be granted in this respect. At this time, then, the economic loss rule will bar any remaining tort claims asserted against Teton Springs.

*See* 8/13/10 Rpt. and Recomm., p. 30, n. 23 (Docket No. 477) (internal citations omitted). In adopting the recommendation, Judge Lodge confirmed the economic loss rule's application to Plaintiffs' negligence claims against Teton Springs. *See* 9/28/10 Order, pp. 2-8 (Docket No. 493).[19]

Therefore, it is hereby recommended that Teton Springs' Motion for Partial Summary Judgment (Docket No. 409) be granted in this respect.

D.    Breach of Contract

Plaintiffs' one paragraph on Defendants' alleged breach of contract reads in full:

Defendants owed contractual and quasi-contractual obligations to Plaintiffs. Defendants' conduct as outlined above materially breached those obligations. As a result of Defendants' breaches of their contractual obligations to Plaintiffs, Plaintiffs suffered damages.

*See* Pls.' Second Am. Compl, ¶ 6.60 (Docket No. 219). Through its Motion for Partial Summary Judgment, Teton Springs argues that "Plaintiffs have not and cannot identify any contract terms or obligations that Teton Springs failed to perform and their breach of contract claims should be

---

[19]  Plaintiffs also claim that "Teton Springs breached statutorily-imposed duties" and, "thus, are liable for negligence per se." *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., pp. 18-20 (Docket No. 452). For the same reasons identified by Judge Lodge in his September 28, 2010 Order Adopting Report and Recommendation, Plaintiffs have not formally stated a negligence per se claim against Teton Springs. *See* 9/28/10 Order, pp. 11-15 (Docket No. 493).

dismissed as a matter of law. *See* Teton Springs' Mot. for Partial Summ. J., p. 18 (Docket No. 409, Att. 1).

Plaintiffs counter with claims that (1) Teton Springs violated its duties of good faith an fair dealing "by failing to disclose its illegal marketing contract with NuWay and All Seasons" and (2) Teton Springs "ha[s] been unjustly enriched by refusing to release the nearly $30,000,000 in profits [it] enjoyed as a result of the scheme." *See* Pls.' Opp. to Teton Springs' Mot. for Partial Summ. J., pp. 20-23 (Docket No. 452). These arguments cannot save Plaintiffs' breach of contract claim.

First, as an observation, Plaintiffs' retort appears to be an afterthought to their Second Amended Complaint's stark breach of contract claim. Neither the pleading itself nor Plaintiffs' opposition to Teton Springs' Motion for Partial Summary Judgment references any actual breach of the lot sale contracts - apparently, the only contracts between the two parties. Instead, the alleged breach relates to a failure to disclose an allegedly illegal marketing contract between Teton Springs, NuWay, and All Seasons. Even so, it is not entirely clear whether such a duty existed and, if so, whether Plaintiffs would have acted any differently had they known of the alleged arrangement.

Second, regardless, "[t]he implied covenant of good faith and fair dealing arises only regarding terms agreed to by the parties." *See Taylor v. Browning*, 927 P.2d 873, 881 (Idaho 1996). The mere fact that Teton Springs failed to make the referenced disclosure does not strike the Court as a commensurate breach of the terms agreed to by the parties in the lot sale contracts, giving rise to a breach of the implied covenant of good faith and fair dealing. *See Jenkins v.*

*Boise Cascade Corp.*, 108 P.3d 380, 390 (Idaho 2005) (". . . the [implied] covenant [of good faith and fair dealing] is an objective determination of whether the parties have acted in good faith in terms of enforcing the contractual provisions. There was no genuine issue raised that any contractual term was not performed in good faith . . . ."). Said another way, there is no obvious argument speaking to the correlative effect of Teton Springs' alleged failure to disclose its marketing agreement with NuWay and All Seasons and any breach of the lot sale contracts between Plaintiffs and Teton Springs; no indication that such action nullified or significantly impaired any benefit or right that Plaintiffs had in the lot sale contracts.

Third, an unjust enrichment claim is ineffectual to support an actual breach of an express contract. *See, e.g.*, IDJI 6.07.2 - Unjust Enrichment - Equitable Theories ("*Even though there is no agreement between the parties*, under certain circumstances where a party has been unjustly enriched by the action of another, the law will require that party to compensate the other for the unjust gain.") (emphasis added); *see also Vanderford Co., Inc. v. Knudson*, 165 P.3d 261, 272 (Idaho 2007) ("The doctrine of unjust enrichment is not permissible where there is an enforceable express contract between the parties which covers the same subject matter. Equity does not intervene when an express contract prescribes the right to compensation."). Even assuming Plaintiffs' ability to assert a separate claim for unjust enrichment, their Second Amended Complaint fails to do so; if anything, it is included (only through Plaintiffs' response to Plaintiffs' Motion for Partial Summary Judgment) as a basis to support their stated breach of contract claim. Idaho law does not support such a theory.

Therefore, it is hereby recommended that Teton Springs' Motion for Partial Summary Judgment (Docket No. 409) be granted in this respect.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 32**

E.    Joint Venture

The Court has already discussed the viability of Plaintiffs' joint venture claim in addressing All Seasons' Motion for Summary Judgment. *See supra* at pp. 20-23. The Court considers Teton Springs' overall involvement in the marketing and sale of the Subdivision property to be more pronounced than that of All Seasons. Nonetheless, NuWay, a major player in this entire meltdown, was an agent of Teton Springs; Teton Springs had *some* relationship with Eagle River, the prominent mortgage broker for Plaintiffs' houses; and the Subdivision itself was a Teton Springs project. Accordingly, the Court sees no reason to move from the ruling it has previously issued on the same, underlying issue. The various parties' involvement, including Plaintiffs' involvement (*see supra* at p. 23, n. 15), is not easily defined, requiring many inferences to be assumed many different ways. In this setting, a dismissal of Plaintiffs' joint venture on summary judgment is inappropriate.

Therefore, it is hereby recommended that Teton Springs' Motion for Partial Summary Judgment (Docket No. 409) be denied in this respect.

## RECOMMENDATION

Based upon the foregoing, it is HEREBY RECOMMENDED that:

1.    Teton Springs'[20] Motion for Partial Summary Judgment (Docket No. 383) be GRANTED, in part, and DENIED, in part, as follows:

     a.    Granted insofar as the first cause of action, violation of the ILSFDA (15 U.S.C. § 1703(a)(1)(A)), be dismissed;

---

[20]  For the purposes of Teton Springs' two Motions for Partial Summary Judgment (Docket Nos. 383 and 409), "Teton Springs" represents Defendants/Counter-Plaintiffs Teton Springs Golf & Casting Club, LLC and Anthony Vest, unless otherwise indicated.

    b.  Granted insofar as the second cause of action, violation of the ILSFDA

       (15 U.S.C. § 1703(a)(1)(B)), be dismissed; and

    c.  Denied as to the third cause of action, violation of the ILSFDA (15 U.S.C.

       § 1703(a)(2)(A-C).

  2.  All Seasons'[21] Motion for Summary Judgment (Docket No. 394) be GRANTED,

in part, and DENIED, in part, as follows:

    a.  Granted insofar as the second cause of action, violation of the ILSFDA

       (15 U.S.C. § 1703(a)(1)(B)), be dismissed;

    b.  Denied as to the third cause of action, violation of the ILSFDA (15 U.S.C.

       § 1703(a)(2)(A-C);

    c.  Denied on the issue of proximate causation;

    d.  Granted insofar as the sixth cause of action, negligence, be dismissed;

    e.  Granted insofar as the seventh cause of action, breach of contract, be

       dismissed; and

    f.  Denied as to the eighth cause of action, joint venture.

  3.  Teton Springs' Motion for Partial Summary Judgment (Docket No. 409) be

GRANTED, in part, and DENIED, in part as follows:

    a.  Granted insofar as the fourth cause of action, violation of the Idaho

       Consumer Protection Act, be dismissed;

    b.  Denied as to the fifth cause of action, fraud;

---

    [21] For the purpose of All Seasons' Motion for Summary Judgment (Docket No. 394),
"All Seasons" represents All Seasons Resort Realty, f/k/a Teton Springs Realty, LLC, Sara
Anderson, Bonnie Etchemendy, Patti Kauf, and Tom Clinton, unless otherwise indicated.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 34**

     c.      Granted insofar as the sixth cause of action, negligence, be dismissed;

     d.      Granted insofar as the seventh cause of action, breach of contract, be

            dismissed; and

     e.      Denied as to the eighth cause of action, joint venture.

4.     Defendant Thomas A. Sarty's Motion for Summary Judgment (Docket No. 403)

     be denied as moot in light of the Court's Order of Dismissal (Docket No. 514).



DATED:  **February 16, 2011**

Honorable Ronald E. Bush
U. S. Magistrate Judge